**PUERTO RICO MARITIME SHIPPING AUTHORITY and Sea–Land Service, Inc.**

v.

**VALLEY FREIGHT SYSTEMS, INC., Appellant.**

No. 87–5594.

United States Court of Appeals, Third Circuit.

Argued March 3, 1988.

Decided Sept. 7, 1988.

Rehearing and Rehearing In Banc Denied Oct. 24, 1988.

Rick A. Rude (argued), Falls Church, Va., for appellant.

Amy Loeserman Klein, David H. Coburn (argued), William E. Cohen, Short, Klein & Karas, P.C., Washington, D.C., for appellees.

Before SEITZ, HIGGINBOTHAM and COWEN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendant Valley Freight Systems, Inc. ("Valley") appeals the order of the district

court granting judgment in favor of plaintiff Puerto Rico Maritime Shipping Authority ("Authority") after a non-jury trial. This court has jurisdiction under 28 U.S.C. § 1291 (1982).

## I. *Factual Background*

The following are the relevant facts as found by the district court. Authority is a vessel-operating common carrier that transports freight between, among other points, Puerto Rico and the mainland United States. In 1982, PRMMI Trucking, Inc. ("Trucking") was created as a wholly-owned subsidiary of Puerto Rico Maritime Management, Inc., which in turn was a wholly-owned subsidiary of Authority. Soon thereafter, Trucking obtained from the Interstate Commerce Commission ("ICC" or "Commission") a certificate of public convenience and necessity authorizing it to provide motor carrier transportation at, among, other places, Elizabeth, New Jersey, and Miami, Florida.

Also in 1982, Authority filed its Tariff 205 with the ICC. This tariff set forth joint through rates for the transportation of freight between San Juan, Puerto Rico and various points in the mainland United States, including Elizabeth and Miami. The joint service governed by the tariff was to consist of motor carrier service by Trucking in conjunction with water carriage by Authority. Trucking concurred in the tariff pursuant to 49 U.S.C. § 10762(b)(2) (1982). In 1983, Trucking executed an agreement with Authority that specified the division of revenues between the two entities on joint routes. During the time period relevant here, Authority and Trucking conducted operations at Elizabeth and Miami and shared terminal facilities [1] at those ports.

Valley is a non-vessel-operating common carrier and stood as a shipper in relation to Authority in the transactions at issue here. Between January 1, 1984, and September 30, 1984, Valley tendered fifty-seven containers or trailers (hereinafter simply "containers") for shipment between San Juan and either Elizabeth and Miami. Some of these shipments were northbound (San Juan to Elizabeth or Miami) and others southbound (Elizabeth or Miami to San Juan).

On the southbound shipments, Valley or its agent delivered the freight to the Authority/Trucking terminal. Trucking then transported each container to Authority's vessel from the point of rest in the terminal to which it had been delivered. Trucking vehicles either drove the freight beneath a crane that lifted it aboard the vessel or, in the case of suitably equipped vessels, drove the freight directly aboard the vessel. On the northbound shipments, Trucking transported the containers from Authority's vessel or a point beside it to a point of rest within the terminal. Valley or its agent then picked up the freight from that point and transported it away from the terminal. All of the shipments arrived at their destination undamaged and in a timely fashion.

For each of the fifty-seven shipments, Valley presented Authority with a bill of lading describing the commodities purportedly being shipped in the containers. Authority applied the provisions of Tariff 205 to determine the appropriate freight charges for each shipment. The shipments were not covered by any other Authority tariff on file with the ICC or any other agency. Under Tariff 205, the price charged for transportation depended on, among other factors, the nature of the commodity being shipped. Authority initially billed Valley for each shipment at the tariff rates applicable to the commodities

---

**1.** By "terminal facility" or "terminal" we mean the port property under the control of Authority and Trucking. These terms are not to be confused with the expression "terminal area," which is a term of art in ICC jurisprudence and refers to a broader area. See 49 U.S.C. § 10523(a)(1) (1982) (exempting certain motor carrier transportation from ICC jurisdiction under §§ 10521–10530 if that transportation takes place within a "terminal area"). The ICC has issued detailed regulations delimiting the geographic scope of the terminal area of various municipalities. 49 C.F.R. §§ 1048–1049 (1987). In general, the terminal area of a municipality includes the entire municipality itself and surrounding municipalities. See 49 C.F.R. § 1048.101 (1987).

described in the bills of lading. Valley paid those bills.

In each case, after the bill was prepared, agents of Authority inspected Valley's containers and found items of freight other than those described in Valley's bill of lading. Applying the provisions of Tariff 205 to the items actually shipped, Authority determined that Valley owed additional freight charges totaling $71,705.62. Authority billed Valley for that amount, but Valley refused to pay, now maintaining that Tariff 205 was inapplicable to its shipments. Authority then commenced this action to recover the undercharge.

Authority filed its complaint in the district court in November 1984. On February 2, 1987, after the entry of the pretrial order and less than one month before the scheduled trial date, Valley for the first time moved the court to stay the proceedings and refer the question of the applicability of Tariff 205 to the ICC pursuant to the doctrine of primary jurisdiction. The court took no action on that motion, and the case proceeded to trial.

The parties stipulated that Valley had misdeclared the contents of its shipments and that it owed the amount of the claimed undercharge if Tariff 205 was applicable. After trial, the court held that Tariff 205 was applicable to Valley's shipments and that Authority was entitled to collect the undercharge. In the alternative, the court held that even if the tariff were inapplicable, Authority would be entitled to collect under contract principles because Valley had agreed to pay the amounts set forth in the tariff. Accordingly, the court entered judgment for Authority in the stipulated amount and awarded pre- and post-judgment interest. At that time the court also formally denied Valley's motion for referral to the ICC.

Valley moved for a new trial. The basis of that motion was the allegation that Authority's witness had not been truthful in his testimony at trial. The court denied the motion. This appeal followed.

## II. *Regulatory Background*

Before turning to Valley's contentions, we first briefly discuss the relevant terminology and regulatory scheme. A "joint through route" is a route involving two or more common carriers in the "through movement of cargo from a point of origin on the line of one carrier to a point of destination on the line of the other." *Pennsylvania v. Interstate Commerce Comm'n*, 561 F.2d 278, 282 (D.C.Cir.1977). A "joint through rate" is the "single charge published by one carrier and concurred in by connecting carriers as the rate that will apply" for carriage along a joint through route. *Id.* at 281–82.

The Intercoastal Shipping Act gives the Federal Maritime Commission ("FMC") exclusive regulatory jurisdiction over common carriers by water in the trade between the mainland United States and Puerto Rico. *See Trailer Marine Transp. Corp. v. Federal Maritime Comm'n*, 602 F.2d 379, 393–97 (D.C.Cir.1979); 46 U.S.C. app. §§ 844, 845b (Supp. II 1984). At the same time, the Interstate Commerce Act permits motor carriers to establish joint through routes with water carriers in the Puerto Rico trade and gives the ICC exclusive jurisdiction over such routes *in their entirety*. *See Puerto Rico Maritime Shipping Auth. v. Interstate Commerce Comm'n*, 645 F.2d 1102 (D.C.Cir.1981); 49 U.S.C. §§ 10521(a)(1)(C), 10703(a)(4)(B), (a)(4)(D)(ii) (1982). A carrier must file a tariff setting forth the rates it charges for transportation on a particular route with the agency that has jurisdiction over the route. 46 U.S.C. app. § 844 (Supp. II 1984) (FMC); 49 U.S.C. § 10761(a) (1982) (ICC). The mere filing of a tariff with an agency does not vest that agency with jurisdiction over a route; rather, jurisdiction turns on the nature of the route itself. *See Trailer Marine*, 602 F.2d at 386 n. 31. If a carrier fails to file a tariff for a particular route with the appropriate agency, the tariff is unenforceable as to that route as a matter of law. *See Burnham Van Serv., Inc. v. United States*, 624 F.2d 41, 43–44 (5th Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1352, 67 L.Ed.2d 336 (1981); 46 U.S.C. app. § 844 (Supp. II 1984); 49 U.S.C. §§ 10761(a), (1982).

### III.  *Referral to the ICC*

At the outset, Valley asserts that the district court erred by refusing to stay its proceedings and refer the central substantive issue in this case to the ICC. To briefly foreshadow our discussion in part V below, that issue is whether the transportation provided by Trucking and Authority constituted a valid joint through route subject to the jurisdiction of the ICC. Valley's argument relies on the doctrine of primary jurisdiction, which "requires initial submission to the [Interstate Commerce] Commission of questions that raise 'issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by [the Interstate Commerce] Act.' " *Interstate Commerce Comm'n v. Atlantic Coast Line R.R.*, 383 U.S. 576, 579, 86 S.Ct. 1000, 1004, 16 L.Ed.2d 109 (1966) (*quoting United States v. Western Pac. R.R.*, 352 U.S. 59, 65, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956)).

The doctrine of primary jurisdiction, despite its name, does not implicate the jurisdiction of a federal court. Rather, it is a principle of judicial administration designed to achieve coordination between administrative agencies and the courts. *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir.1983). Accordingly, a district court's decision not to submit an issue for initial determination by an agency is reversible only if it constituted an abuse of discretion. *See United States v. Bessemer & Lake Erie R.R.*, 717 F.2d 593, 599 (D.C.Cir.1983); *cf. Western Pacific*, 352 U.S. at 64, 77 S.Ct. at 165 ("No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.").

In this case, we believe that the district court acted within its discretion in declining to invoke the doctrine of primary jurisdiction, for two reasons. First, Valley did not move for referral to the ICC until virtually the eve of trial, over two years after Authority filed its complaint. Valley offers no explanation for its failure to make that motion at an earlier point in the proceedings. Given the last-minute nature of Valley's motion, principles of sound judicial administration counseled against referral.

Second, and more fundamentally, the doctrine of primary jurisdiction is simply inapplicable here. By Valley's own characterization, the issue of which it sought referral was whether the ICC had jurisdiction over the transportation service provided by Trucking and Authority. Yet the primary jurisdiction doctrine presupposes that the administrative agency to which referral is made has jurisdiction over the subject matter of the action. Indeed, the rationale of the doctrine is that the subject matter falls so squarely within the agency's domain that a court should permit the agency to initially resolve the question presented. Valley's argument for referral amounts to the assertion that the ICC has primary jurisdiction to determine its own jurisdiction, a proposition for which there is no support.[2] *Cf. Trailer Marine*, 602 F.2d at 381 (jurisdictional dispute between ICC and FMC must be settled by federal court).

Valley argues that the district court's refusal to refer the jurisdictional issue to the ICC constituted an abuse of discretion in light of the court's referral of a similar issue in a related case. The related case, *Trailer Marine Transp. Corp. v. Valley Freight Sys., Inc.*, Civ. No. 84–1315, also arises from Valley's refusal to pay claimed undercharges to a common carrier participant in an alleged joint through route in the Puerto Rico trade. There, as here, Valley asserts on the merits that an ICC tariff is inapplicable because the transpor-

---

**2.**  *United States v. United States Smelting, Refining & Mining Co.*, 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750 (1950), and *United States v. American Sheet & Tin Plate Co.*, 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186 (1937), are not to the contrary. Neither case addressed the doctrine of primary jurisdiction. Rather, those cases simply held that courts reviewing ICC orders should defer to the ICC's highly fact-based determination of what constitutes "transportation" under the Interstate Commerce Act.

tation service at issue was not a valid joint through service subject to ICC jurisdiction.

Assuming without deciding the propriety of referral in the related case, it is clear that the district court was justified in treating the present case differently. That case was commenced at approximately the same time as this one, but there Valley moved for referral in June 1985, at an early stage of the proceedings. Moreover, the related case presents a number issues in addition to the jurisdictional question. One of the additional issues is the reasonableness of certain rates set forth in the carrier's tariff, an issue that has long been recognized as being within the primary jurisdiction of the ICC. *See Texas & Pac. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 448, 27 S.Ct. 350, 358, 51 L.Ed. 553 (1907). Given that the reasonableness issue had to be decided by the ICC, the court might quite reasonably have concluded that the ICC should at the same time be permitted to consider whether it had jurisdiction over the alleged joint through route. It does not follow, however, that the court abused its discretion by declining to refer the issue in this case, where no reasonableness question is presented.[3]

## IV. *Correctness of the District Court's Factual Findings*

Next, Valley challenges certain findings of fact made by the district court. These findings may not be set aside on appeal unless they are clearly erroneous. Fed.R. Civ.P. 52(a).

Valley disputes two of the court's findings. First, Valley contends that the court erred in finding that Trucking acted as an intermediary between Valley or its agents and Authority on southbound shipments. Valley maintains that it delivered those shipments directly to Authority. The court's finding on this matter was essential to its holding because Tariff 205 by its terms applied only to movements of freight in which *both* Trucking and Authority participated. The tariff was inapplicable if Authority alone handled the freight.

Second, Valley argues that the court erred in finding that Trucking concurred in Tariff 205 as required by 49 U.S.C. § 10762(b)(2). Both parties agree that Tariff 205 was ineffective unless Trucking concurred in it.

Having considered Valley's arguments and examined the record, we conclude that the district court's findings are supported by credible evidence and are not clearly erroneous.

## V. *Applicability of Tariff 205*

We now turn to Valley's principal contention—that Tariff 205 did not apply to the shipments at issue because the transportation provided by Trucking and Authority was not a joint through service subject to the jurisdiction of the ICC. This argument assumes the correctness of the district court's factual findings and presents a question of law as to which our review is plenary.

Authority's water carrier service between the United States and Puerto Rico would, without more, be subject to FMC jurisdiction pursuant to the Intercoastal Shipping Act. *Trailer Marine*, 602 F.2d at 393–97. Authority claims authority for its alleged joint through route with Trucking under 49 U.S.C. § 10703. This section provides in pertinent part as follows:

(a) *A carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title [49 U.S.C. §§ 10501–10561] shall establish through routes as follows:*

. . . .

(4)(A) A motor common carrier of property may establish through routes

---

**3.** The ICC administrative law judge issued his decision in the related case during the briefing of this appeal. *Valley Freight Sys., Inc. v. Trailer Marine Transp. Corp.*, No. MC–C–30017 (Interstate Commerce Comm'n, October 27, 1987). Both parties to that proceeding appealed to the Commission, which issued its decision after we had heard oral argument in this case. *Valley Freight Sys., Inc. v. Trailer Marine Transp. Corp.*, No. MC–C–30017 (Interstate Commerce Comm'n, July 13, 1988).

and joint rates and classifications ... with water common carriers....

49 U.S.C. § 10703 (1982) (emphasis added).

As the italicized language indicates, the existence of a valid joint through route requires that the motor carrier's portion of the route be independently subject to ICC jurisdiction under 49 U.S.C. §§ 10501–10561. The only one of those provisions that is arguably relevant to Trucking's leg of the alleged joint through route is section 10521, which sets forth the ICC's general jurisdiction over motor carriers. That section reads in pertinent part as follows:

> (a) [T]he Interstate Commerce Commission has jurisdiction over transportation by motor carrier ... to the extent that passengers, property, or both, are transported by motor carrier—
>
> (1) between a place in—
>
> ....
>
> (C) the United States and a place in a territory or possession of the United States ...;
>
> ....
>
> (E) ... and
>
> (2) ... on a public highway.

49 U.S.C. § 10521 (1982). Section 10521 thus establishes two prerequisites of ICC jurisdiction. The motor carrier service must (1) be interstate in nature (a requirement satisfied if the transportation is between a state and a territory[4]), and (2) involve transportation on a public highway.

Trucking's motor service clearly met the first requirement. It is settled that transportation between two points in the same state is "interstate" in character if it is part of a continuous interstate movement of freight. *Texas & N.O.R.R. v. Sabine Tram Co.*, 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913).

Whether Trucking's service satisfied the "on a public highway" requirement presents a closer question. Valley strenuously maintains that the service did not meet that requirement. In support of its position, Valley first points to the district court's finding that on each of the fifty-seven shipments Trucking transported the freight between Authority's vessel and a point of rest *within* the Authority–Trucking terminal facility.[5] Next, Valley notes that the terminal facilities at both Elizabeth and Miami were controlled by Authority pursuant to long-term lease agreements with the port authorities of those cities. Neither facility was open to the public.[6] Valley then concludes that, because Trucking transported the freight entirely within privately controlled terminal facilities, its services did not meet the "on a public highway" requirement of section 10521. In other words, Valley contends that Trucking's service was not subject to ICC jurisdiction because Trucking itself did not carry the freight over public thoroughfares.

---

**4.** Puerto Rico is considered a "territory" for purposes of the Interstate Commerce Act. *Trailer Marine,* 602 F.2d at 384–85 & n. 26.

**5.** This finding flowed logically from the parties' pre-trial stipulation that Valley or its agent transported each of the shipments to the terminal facility. The stipulation read as follows:

> On all southbound shipments exiting the port of Elizabeth, plaintiff and defendant stipulate that defendant delivered the involved shipments to the terminal facilities at Fleet and Bombay Streets. On all northbound shipments plaintiff and defendant stipulate that defendant picked up the shipments at the terminal facilities at Fleet and Bombay Streets, Elizabeth, New Jersey. On the shipments which originated or terminated in Miami, Florida, defendant arranged for and paid for the drayage of the shipments between the terminal facilities and Valley Freight System's terminal facilities.

**6.** This conclusion is supported by the trial testimony of Authority's witness, Walter Huresky, Vice President for Pricing and Regulatory Affairs of Puerto Rico Maritime Management, Inc. On cross-examination, Huresky testified as follows concerning the Elizabeth terminal facility:

> Q: Is there a fence around it?
> A: Fences around part of it, not all of it.
> ....
> Q: But let me ask you, is it a public facility?
> A: No.
> Q: It's restricted access?
> A: Yes.
> Q: And access is restricted by PRMSA, isn't it?
> A: Well, yes. Certainly.

The record contains no specific references to Authority's restriction of access to the Miami terminal, but Authority does not contend that its control over the Miami facility was any less than its control over the Elizabeth terminal.

Valley's reading of the "on a public highway" requirement is directly at odds with the recent decision of the ICC in *Valley Freight Sys., Inc. v. Trailer Marine Transp. Corp.*, MC–C–30017 (Interstate Commerce Comm'n, July 13, 1988), the related case that the district court referred to the Commission under the doctrine of primary jurisdiction. There the Commission ruled, on facts indistinguishable from those of the present case, that motor carrier service provided entirely within a privately controlled marine terminal as part of a continuous interstate movement of freight is subject to ICC jurisdiction. The Commission noted that the containers hauled by the motor carrier are regularly used on public thoroughfares and in fact travel on public roads either directly before or directly after the motor carrier handles them. The Commission reasoned that this gives the motor carrier's inside-the-terminal service a sufficient nexus with transportation on the highways to bring that service within the jurisdiction of the ICC.[7] *Id.* at 8. Accordingly, the Commission concluded that the motor carrier service properly forms the basis for a joint motor-water through route. *Id.* at 9.

■ Were the question being considered as an original matter, one might reasonably prefer Valley's reading of the "on a public highway" requirement to the Commission's less-than-literal interpretation. However, the Supreme Court has made clear that a court must grant substantial deference to an agency's interpretation of the statute it administers. When Congress has not directly and unambiguously addressed the precise question at issue, a court must accept the interpretation set forth by the agency so long as it is a reasonable one. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). This rule of deference is fully applicable to an agency's interpretation of its own jurisdiction. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844, 106 S.Ct. 3245, 3254, 92 L.Ed. 2d 675 (1986).

■ It is plain that Congress has not addressed the question of whether motor carrier service of the type at issue here is within ICC jurisdiction. This is hardly surprising in view of the extremely fact-specific nature of the problem. The sole inquiry, then, is whether the Commission acted reasonably in determining that the service meets the "on a public highway" requirement of the Interstate Commerce Act. We conclude that it did. In granting authority over joint through routes to the ICC, the Act contemplates that ICC jurisdiction will attach even in cases where the motor carrier leg of the route—the technical prerequisite of jurisdiction—is *de minimis.* See *Sea–Land Serv., Inc. v. Federal Maritime Comm'n*, 404 F.2d 824, 827 (D.C.Cir.1968) ("[T]hrough routes have historically been validated in situations where one of the participating transporter's activities have been extremely minimal."); *Alaska S.S. Co. v. Federal Maritime Comm'n*, 399 F.2d 623, 626 (9th Cir.1968). Thus, it is certainly consistent with the statutory scheme for the ICC to assert jurisdiction over motor-water routes in which the motor leg consists solely of a short haul entirely within a marine terminal. We can think of

7. The Commission based its reasoning not on the "on a public highway" requirement of § 10521 but on virtually identical language in § 10102(17)'s definition of a "motor vehicle." That provision defines a motor vehicle as "a vehicle ... propelled or drawn by mechanical power and used *on a highway* in transportation."

On first blush, it might appear odd that the Commission chose to analyze the jurisdictional problem by way of a definitional subsection rather than the general jurisdictional language of § 10521. However, the Commission's analysis was designed primarily to refute the reasoning of the ALJ, who had ruled that inside-the-terminal motor carriage is not within ICC juris-

diction because it is not "motor vehicle" transportation. In any event, that the Commission analyzed the problem via § 10102(17) rather than § 10521 does not undermine the relevance of its reasoning to the present case. Although the former section refers to "a highway" and the latter to "a public highway," that difference in wording is inconsequential. A "highway" is a road open to all people for passage at their pleasure, i.e., an inherently "public" way. 39A C.J.S. *Highways* § 1(1) (1976). Thus, if motor service satisfies the "on a highway" requirement in the definition of "motor vehicle" transportation, it also satisfies the "on a public highway" requirement of section 10521.

no policy justification for treating such routes differently from those in which the motor haul originates on a public thoroughfare just outside the terminal gates.

The "on a public highway" language is sufficiently flexible to bear the Commission's interpretation. As noted earlier in our discussion, the courts have long attached a less-than-literal meaning to the other prerequisite of ICC jurisdiction, that the transportation be "interstate" in character. In determining whether a carrier's service meets that prerequisite, the courts consider the character of the entire movement and not just that of the particular carrier's participation in the movement. *See Texas & N.O.R.R. v. Sabine Tram Co.*, 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913). It was reasonable for the Commission to read the "on a public highway" language of the Act in a similarly liberal fashion and to take into account the use of the containers before and after the motor carrier's handling of them.

Thus, we believe that the Commission's interpretation controls this case. Accordingly, we hold that the district court did not err in determining that the transportation service provided by Trucking and Authority constituted a joint through route subject to ICC jurisdiction. Authority's Tariff 205 applied to the fifty-seven shipments at issue, and Authority is entitled to recover the claimed undercharge.[8]

### VI. *Valley's New Trial Motion*

Valley's motion for a new trial was based on the allegation that Authority's witness had given material false testimony at trial. The witness, Walter Huresky, Vice President for Pricing and Regulatory Affairs of Puerto Rico Maritime Management, Inc., testified that the Trucking vehicles participating in joint through routes were marked to indicate that they were part of the Trucking fleet. That testimony was relevant because it showed that Trucking and Authority participated in the routes as separate entities, as required by the terms of Tariff 205. In its new trial motion, Valley proffered photographs from September 1985, indicating that certain motor vehicles at Authority's Jacksonville, Florida, terminal facility were not in fact identified as Trucking vehicles. The district court did not hold a hearing on Valley's motion, and it denied the motion without comment.

A district court's denial of a new trial motion is reversible only for abuse of discretion. In non-jury cases, the grant of a new trial is usually reserved for instances in which the trial was "infected with 'manifest errors of law or fact.' " *United States Gypsum Co. v. Schiavo Bros., Inc.*, 668 F.2d 172, 180 (3d Cir.1981) (*quoting* 6A *Moore's Federal Practice* ¶ 59.07 (2d ed.)), *cert denied*, 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). In this case, the court acted well within its discretion in denying Valley's motion. The photographs relied on by Valley do not in any way suggest that the fifty-seven shipments at issue here were not handled in compliance with the terms of Tariff 205. The photographs were taken one year after the last of those shipments was completed. More significantly, they were taken at a facility that has no connection with the disputed shipments. In short, Valley failed to show that the testimony of Authority's witness caused the district court to make material errors of fact.[9]

### VII. *Conclusion*

For the foregoing reasons, we will affirm the judgment of the district court.

---

8. In light of our resolution of this issue, we need not address Authority's alternative argument that recover is justified under contract principles regardless of the validity of the tariff.

9. Valley asserts that the district court abused its discretion by not holding a hearing on the new trial motion and by failing to make specific findings of fact in denying the motion. Those contentions are meritless.

On appeal Valley argues for the first time that a new trial is warranted by Authority's conduct in allegedly withholding certain documents requested during discovery. Because Valley failed to preserve this argument before the district court, we do not address it now. *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir.1976).