497 S.E.2d 755

STATE of West Virginia ex rel. BELL ATLANTIC–WEST VIRGINIA, INC., a West Virginia Corporation, and Bell Atlantic Corporation, a Delaware Corporation, Petitioners,

v.

Honorable Lyne RANSON, Judge of the Circuit Court of Kanawha County; E. Keith Morgan, Michael T. Sword, Daniel P. O'Connor, Jean Sanson, dba C.J.'s Auto Sales; and Doris J. Graley, individually and on behalf of all others similarly situated, Respondents.

No. 23942.

Supreme Court of Appeals of West Virginia.

Submitted March 25, 1997.

Decided July 16, 1997.

Dissenting Opinion of Justice Maynard July 17, 1997.

Gerard R. Stowers, Geoffrey A. Haddad, Bowles Rice McDavid Graff & Love, David B. Frost, Joseph J. Starsick, Jr., Charleston, for Petitioners.

Marvin W. Masters, Anthony J. Majestro, Richard A. Monahan, Masters & Taylor, Charleston, for E. Keith Morgan, Michael T. Sword, Daniel P. O'Connor, Jean Sanson and Doris J. Graley.

Steven Hamula, Charleston, for Amicus Curiae Public Service Commission of West Virginia.

McHUGH, Justice:

Petitioners Bell Atlantic–West Virginia and Bell Atlantic Corporation invoke this Court's original jurisdiction pursuant to *W.Va. Const.* art. VIII, § 3 and *W.Va.Code,* 51–1–3 [1923] and request that a writ of prohibition be directed against the Honorable Lyne Ranson, Judge of the Circuit Court of Kanawha County. Petitioners had filed motions to dismiss plaintiffs' class action [1] complaint, which complaint alleges that petitioners violated the West Virginia Antitrust Act, *W.Va.Code,* 47–18–1, *et seq.,* and the West Virginia Consumer Credit and Protection Act, *W.Va.Code,* 46A–6–101, *et seq.,* and further alleges various common law claims, all

1. *See W.Va.R.Civ.P.* 23.

rooted in the inside wire maintenance service plans offered to plaintiffs and others by a "negative option." Plaintiffs essentially allege that petitioners used false, misleading and deceptive sales tactics and made similar representations to its telephone customers with regard to the inside wire maintenance service plans.

Petitioner Bell Atlantic–West Virginia (hereinafter "BA–WV") filed a motion to dismiss pursuant to *W.Va.R.Civ.P.* 12(b)(1) on the ground that the West Virginia Public Service Commission ("PSC") rather than the circuit court has subject matter jurisdiction of this case. Petitioner Bell Atlantic Corporation (hereinafter "BAC") filed a motion to dismiss pursuant to *W.Va.R.Civ.P.* 12(b)(2), alleging that the circuit court does not have personal jurisdiction over it, a nonresident and foreign corporation. BAC also moved to dismiss under Rule 12(b)(6), on the ground that plaintiffs have failed to state a claim upon which relief can be granted. In separate orders entered July 30, 1996 (hereinafter referred to as "BA–WV order" and "BAC order"), the circuit court denied the petitioners' motions to dismiss. It is enforcement of these orders that petitioners seek to prohibit.

I.

Prior to 1985, BA–WV, formerly the Chesapeake and Potomac Telephone Company of West Virginia ("C & P"),[2] maintained its customers "inside wiring," which term "generally refers to the telephone wires within a customer's home or place of business that are on the customer's side of the point of intersection between the telephone company's communications facilities and the customer's facilities." *National Ass'n of Regulatory Utility Com'rs v. Federal Communications Com'n,* 880 F.2d 422, 425 (D.C.Cir.1989). The cost of maintaining a customer's inside wiring was included in the customer's basic service rates. Under this system, "each customer pa[id] a portion of the costs for [C & P's] inside wire maintenance work even if that customer perform[ed] the work himself or use[d] someone other than [C & P]." *AT*

2. C & P became "Bell Atlantic–West Virginia" on January 13, 1994.

& T Communications of W.Va. v. C & P Telephone Co. of W.Va., 73 ARPSCWV 702, 771 (Case No. 84–244–T–C) (September 6, 1985).

In 1985, the PSC authorized the optional wire maintenance plan proposed by C & P, under which the charges for inside wire maintenance were "unbundled," that is, no longer included in the basic service rates charged C & P telephone customers. See generally Id. Instead, customers could subscribe to the plan for a monthly charge. Id. In exchange for this monthly charge, C & P would maintain the inside wire at no extra charge. Id. This plan was designed "so that the [monthly] option will apply automatically to any customer unless that customer affirmatively acts to 'opt out' of the plan." Id. at 772.[3] Customers could choose to maintain the inside wire themselves or to retain another vendor to perform the maintenance, thereby "opting out" of the plan. Id. Though these customers could engage C & P to maintain or repair their inside wire, the cost of such maintenance or repair could be considerable.

Subsequently, in 1986, C & P filed with the PSC a petition for consent to detariff rates and regulations governing the provision of inside wiring services. The C & P Telephone Co. of W.Va., a corporation. Petition for consent to detariff rates and regulations governing the provision of inside wiring service, 73 ARPSCWV 3148 (June 3, 1986). The detariffing proposed by C & P's petition constituted a partial detariff and was not full deregulation. See Id. at 3149. The PSC approved C & P's petition, indicating, inter alia, that "C & P will hereinafter furnish inside wiring services at such prices and upon such terms as it shall from time-to-time determine[.]" Id. The PSC further required C & P to refile the revised tariff pages, id. at 3150, which it did on or about July 8, 1986. The PSC further stated that "in approving C & P's petition, [the PSC] retains the right to reimpose the more traditional forms of regulation on C & P's provision of inside wiring services until the same is preempted by either [the Federal Communications Commission] order or further order of [the PSC]." Id. at 3149–50.[4]

BA–WV filed additional tariffs resolving issues regarding inside wire and power companies, effective September 16, 1987. See finding of fact no. 4 of BA–WV order. According to the circuit court, this September 16, 1987 PSC order "was the last substantive regulatory action taken by the PSC with respect to [inside wire maintenance service]." Id. (emphasis added).

---

3. In authorizing the optional wire maintenance plan, the PSC indicated that

C & P's tariff should be clarified to indicate that the maintenance service provided shall include all inside wiring, including jacks and hardwired instruments. We believe that the unbundling of the maintenance service is reasonable and is not detrimental to C & P's customers in any way. If we rejected the plan, the substantial revenue estimated to be generated by the [monthly] charge would not be available and therefore these dollars would be spread to all customers in C & P's base rates. The [PSC] staff's concern that the [monthly] charge is a hidden base rate element is contrary to fact. The truth is that a portion of C & P's expenses that are currently recovered in base rates will be identified as a separate charge for wire maintenance. Furthermore, customers will be benefitted from the freedom of choice to decline the maintenance plan, thereby reducing their bill by [the amount of the monthly charge].

Id. at 771–72.

4. Effective January 1, 1987, the Federal Communications Commission ("FCC") directed that the installation and maintenance of inside wiring be detariffed. See National Ass'n of Regulatory Utility Com'rs, 880 F.2d at 426. The FCC believed that such detariffing would ensure that the costs of connecting the wiring from the telephone company's central switching facilities to the customers, including the cost of inside wiring, would be paid by the customer. Id. The FCC further believed that detariffing would stimulate competition and new entry into the inside wiring market which "would lead to savings for customers." Id. The FCC also preempted states from regulating inside wiring, having found that "deregulation (which would relieve telephone companies of their existing obligation to install and maintain inside wiring) would not result in the unavailability of such services even in rural areas because of 'persuasive' evidence of the development of competition in the inside wiring marketplace and the availability of 'do-it-yourself' kits." Id. In National Ass'n of Regulatory Utility Com'rs, supra, a number of state utility commissions and related associations successfully challenged the preemptive effect of the FCC's detariffing order. On remand, the FCC ultimately permitted states to regulate inside wiring.

On April 27, 1988, the PSC adopted a "Flexible Regulation Plan" which changed the manner in which it regulated certain BA–WV services. This plan detariffed the inside wire maintenance service but indicated the PSC's reservation of the right to regulate this service. Reservation of this right to regulate notwithstanding, plaintiffs point out and the trial court found, that at the time the April 27, 1988 order was entered by the PSC, the *FCC's* order *preempting* regulation, *see* n. 4, *supra*, was in effect. Thus, "the FCC preemption order would have effectively prevented any such regulation of [inside wire maintenance service.]" Finding of fact no. 6 of BA–WV order.

Upon expiration of the Flexible Regulation Plan, the PSC adopted C & P's proposed Incentive Regulation Plan. *[PSC] Order*, Case No. 90–613–T–PC, 1991 WL 519803 (December 20, 1991) reflects the division of C & P's services into four categories, "each subject to varying degrees of regulatory oversight and pricing flexibility." *Id.* at p. 5. "For services designated as Category III(b) [which category includes inside wiring services], C & P will not be required to file tariffs." *Id.* The PSC order further states however "that for those services contained in Category III(b), the fact that tariffs are not required does not mean that these services are totally deregulated. Therefore, the [PSC] still retains the authority to entertain and rule upon matters involving Category III(b) services." *Id.* at p. 11.

The trial court found, in the July 30, 1996 BA–WV order, that

[u]nder the terms of the current[ ] regulatory structure, BA–WV can, without even notifying the PSC, change the rates, terms, and conditions applicable to [inside wire maintenance service] and provide its customers with notice of the changes on such terms and in such form as it deems appropriate. Similarly, there is no provision in the regulatory scheme for regulation of the marketing of the 'optional' [inside wire maintenance service] plans.

Finding of fact no. 8, in part. Although the PSC had previously retained the right to regulate inside wire maintenance services, the trial court found that BA–WV had pro-

vided no evidence that it, in fact, exercised that right. *Id.*

The trial court further found that

[t]he only activity of the PSC in any way related to inside wiring presented to the Court was one formal proceeding involving a customer complaint and several informal customer complaints. The formal complaint involved a charge to a customer to repair inside wiring work by a customer whose rewiring resulted in the disruption of a third party's service—an adjudication clearly distinguishable from the plaintiffs' current complaints. With respect to the informal complaints, these complaints, which are received and processed by the PSC at the staff level constitute an effort to mediate the dispute between the utility and the customer and explicitly do not constitute an adjudication of the customer's claim let alone regulation of [inside wire maintenance service].

Finding of fact no. 9 of BA–WV order (*citing* 150 CSR 1–6.1 ("Informal complaints")).

Plaintiffs filed their class action complaint individually and on behalf of the class of all residential and simple business customers of the petitioners similarly situated in West Virginia who have been charged by petitioners and who have paid them for optional monthly inside wire maintenance service between the date the service became optional and the date the court sets for closing the class. The complaint alleges, *inter alia*, that petitioners offered the

'optional' [inside wire maintenance] services by a 'negative option' or 'default' sales scheme, which [petitioners] announced in an initial billing insert obscured in the Plaintiffs' monthly billing envelopes. Through the use of this billing insert, [petitioners] enrolled (and included in the customers' bills the monthly [inside wire maintenance] charge) all customers who did not affirmatively request that the service be discontinued. This monthly service charge was routinely increased from 1987 to present.

Under this scheme, Plaintiffs were responsible for notifying the [petitioners] if they chose not to subscribe to [inside wire

maintenance service]. If a customer remained silent, [petitioners] billed that customer for 'optional' monthly [inside wire maintenance service] as if the customer had affirmatively subscribed.

Although these initial billing inserts did not communicate a definite and certain 'offer' containing the essential terms, conditions, exclusions and limitations of a 'contract' the [petitioners] used this 'negative option' or 'default' sales scheme to treat the plaintiffs' silence or inaction as acceptance of the 'offer' to sell 'optional' monthly [inside wire maintenance service.]

The plaintiffs' complaint further alleges, *inter alia*, that petitioners coerced customers to accept inside wire maintenance service by employing "false, misleading, fraudulent and/or deceptive acts" enumerated in the complaint and further, that the billing inserts included obscurely in customers' monthly telephone bills "contained false, misleading, and deceptive representations with respect to [inside wire maintenance service]." Plaintiffs allege that petitioners

intentionally failed to disclose material information necessary to make an informed decision whether to subscribe to [inside wire maintenance service.] Further, the [petitioners] disseminated false, misleading, and deceptive representations for the purpose of inducing their customers to subscribe to [inside wire maintenance service] when they knew that such customers would not have subscribed to the service had full disclosure been made.

Finally, plaintiffs, who had unknowingly been charged by petitioners for inside wire maintenance service, allege that "[petitioners] have willfully acquired and maintained a monopoly in providing [inside wire maintenance service] ... [thus] ... depriv[ing] consumers of the benefits of economic competition in the [inside wire maintenance service] industry."

Plaintiffs assert that as a result of petitioners' conduct with regard to inside wire maintenance service, they have violated the West Virginia Antitrust Act, *W.Va.Code*, 47–18–1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, *W.Va.Code*, 46A–6–101, *et seq.* Plaintiffs additionally claim

that "[petitioners] have had and received money which, in justice and fairness, should be refunded and paid over to plaintiffs and other class members[;]" that "the purported 'contracts' under which [petitioners] collected monies for [inside wire maintenance service] are void or voidable and [that plaintiffs] are entitled to restitution of all charges paid by them for [inside wire maintenance service][;]" that petitioners have violated their duty of good faith and fair dealing; that petitioners' conduct constitutes fraud; that petitioners concealed plaintiffs' causes of action through misrepresentations and omissions with respect to inside wire maintenance service; and that petitioners prevented plaintiffs from discovering their cause of action through fraudulent concealment. Plaintiffs seek, *inter alia*, to recover all amounts paid by them to petitioners, plus interest, punitive damages, attorneys fees and costs.

Petitioner BA–WV subsequently filed a motion to dismiss pursuant to *W.Va.R.Civ.P.* 12(b)(1), arguing that the PSC rather than the circuit court has subject matter jurisdiction in this case. Petitioner BAC filed a motion to dismiss under *W.Va.R.Civ.P.* 12(b)(2) and (6), contending that the circuit court does not have personal jurisdiction over it and that plaintiffs have failed to state a claim on which relief can be granted.

A hearing was conducted on March 26, 1996 in Kanawha County Circuit Court at which time the trial judge granted the parties 60 days to conduct discovery on the jurisdiction issues and to submit to the court additional briefs on the motions to dismiss. As indicated above, the trial court ultimately denied the motions to dismiss by orders entered July 30, 1996. It is enforcement of these orders that BA–WV and BAC seek to prohibit.

## II.

■ It is BA–WV's contention that the PSC has exclusive jurisdiction of the inside wire maintenance issues in this case and that plaintiffs are required to exhaust their administrative remedies before they may seek judicial relief. Thus, BA–WV argues that this Court should grant its petition for a writ

of prohibition which would effectively preclude the circuit court from conducting further proceedings in this case.

■ Under the exhaustion of remedies doctrine, a claim must be " 'cognizable in the first instance by an administrative agency *alone* [ ][and] judicial interference is withheld until the administrative process has run its course.' " *In re Long Distance Telecommunication Litigation,* 612 F.Supp. 892, 895 (D.C.Mich.1985), *aff'd in part, rev'd in part on other grounds,* 831 F.2d 627 (6th Cir.1987) (*quoting United States v. Western Pacific RR Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)) (emphasis added). *See United States v. Radio Corporation of America,* 358 U.S. 334, 346 n. 14, 79 S.Ct. 457, 465 n. 14, 3 L.Ed.2d 354, 363 n. 14 (1959); *Daily Advertiser v. Trans–La,* 612 So.2d 7, 27 (La. 1993) ("the exhaustion rule applies when exclusive jurisdiction exists in the administrative agency, and the courts have only appellate, as opposed to original, jurisdiction to review the agency's decision."); *Mazzola v. Southern New England Telephone Co.,* 169 Conn. 344, 363 A.2d 170, 174 (1975); 73 C.J.S. *Public Administrative Law and Procedure* § 38 at 445 (1983). *See also* syl. pt. 4, *Mounts v. Chafin,* 186 W.Va. 156, 411 S.E.2d 481 (1991) (" ' " 'The general rule is that where an administrative remedy is provided by statute or by rules and regulations having the force and effect of law, relief must be sought from the administrative body, and such remedy must be exhausted before the courts will act.' Syl. Pt. 1, *Daurelle v. Traders Federal Savings & Loan Association,* 143 W.Va. 674, 104 S.E.2d 320 (1958)." Syl. Pt. 1, *Cowie v. Roberts,* [173 W.Va. 64], 312 S.E.2d 35 (1984).' Syllabus Point 1, *Hechler v. Casey,* 175 W.Va. 434, 333 S.E.2d 799 (1985).")

The PSC's jurisdiction is statutory and "shall extend to all public utilities in this state, and shall include any utility engaged in . . . [the] transmission of messages by telephone[.]" *W.Va.Code,* 24–2–1 [1991], in relevant part. The PSC

> shall have power to enforce, originate, establish, change and promulgate tariffs, rates, joint rates, tolls and schedules for all public utilities: Provided, That the [PSC]

may exercise such rate authority over municipal utilities only under the circumstances set forth in section four-b [§ 24–2–4b] of this article. And whenever the [PSC] shall, after hearing, find any existing rates, tolls, tariffs, joint rates or schedules unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the commission shall by an order fix reasonable rates, joint rates, tariffs, tolls or schedules to be followed in the future in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any provisions of law[.]

*W.Va.Code,* 24–2–3 [1983], in part.

The PSC's jurisdiction is further derived from *W.Va.Code,* 24–2–7(a) [1979], which provides:

> Whenever, under the provisions of this chapter, the [PSC] shall find any regulations, measurements, practices, acts or services to be unjust, unreasonable, insufficient or unjustly discriminatory, or otherwise in violation of any provisions of this chapter, or shall find that any service is inadequate, or that any service which is demanded cannot be reasonably obtained, the [PSC] shall determine and declare, and by order fix reasonable measurements, regulations, acts, practices or services, to be furnished, imposed, observed and followed in the state in lieu of those found to be unjust, unreasonable, insufficient, or unjustly discriminatory, inadequate or otherwise in violation of this chapter, and shall make such other order respecting the same as shall be just and reasonable.

Though the PSC has jurisdiction over matters concerning inside wire maintenance services, its jurisdiction in this case is *not* exclusive and thus, the exhaustion of remedies doctrine does not apply. Indeed, the circuit court as well "has original 'subject matter' jurisdiction of the questions raised in the complaint filed in that court." *Mazzola,* 363 A.2d at 173. As indicated above, plaintiffs seek damages allegedly caused by petitioners' various common law violations, including money had and received; monies paid under void or voidable contract; breach of good

faith and fair dealing; fraud; and fraudulent concealment preventing plaintiffs from discovering their causes of action. Plaintiffs' complaint further alleges that petitioners have violated West Virginia's Antitrust and Consumer Credit and Protection Acts. All of plaintiffs' claims, which stem from the allegedly fraudulent and deceptive sale and marketing of inside wire maintenance service plans, are clearly within the usual province of circuit courts,[5] see *W.Va. Const.* art. VIII, § 6 ("circuit courts shall have original and general jurisdiction of all civil cases at law[.]"); *W.Va.Code*, 51–2–2 [1978], and require no special regulatory expertise. See *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1104 (3d Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 64, 136 L.Ed.2d 25 (1996). The circuit court and the PSC thus have concurrent jurisdiction over the controversy concerning inside wire maintenance services. The issue before us then is whether the circuit court should have deferred this case to the PSC pursuant to the primary jurisdiction doctrine.

Not unlike the exhaustion of remedies doctrine, the doctrine of primary jurisdiction " 'is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' "[6] *In re Long Distance Telecommunication Litigation*, 612 F.Supp. at 895 (quoting *Western Pacific RR*, 352 U.S. at 63–64, 77 S.Ct. at 165). Primary jurisdiction " 'applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the adminis-

trative body for its views.' " *Id.* See *Radio Corporation of America*, 358 U.S. at 346 n. 14, 79 S.Ct. at 465 n. 14, 3 L.Ed.2d at 363 n. 14; *Denver Union Stockyard Co. v. Denver Live Stock Com'n Co.*, 404 F.2d 1055, 1056–57 (10th Cir.1968), *cert. denied*, 394 U.S. 1014, 89 S.Ct. 1631, 23 L.Ed.2d 40 (1969) (primary jurisdiction applies when " 'the determination demands the exercise of administrative discretion requiring the special knowledge and experience of the administrative tribunal or where court action will possibly interfere with or impair the coherence and uniformity of an intricate administrative program.' " (citations omitted)); *Oasis Petroleum Corp. v. U.S. Dept. of Energy*, 718 F.2d 1558, 1562–63 (Temp.Emerg.Ct.App.1983); *National Communications Ass'n, Inc. v. AT & T*, 813 F.Supp. 259, 262 (S.D.N.Y.1993) (primary jurisdiction "permits the judiciary to refer a matter extending beyond 'the conventional experience of judges' or falling within the realm of administrative discretion to the administrative agency possessing expertise in the matter at issue." (quoting *Far East Conference v. United States*, 342 U.S. 570, 573, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952) and *Goya Foods, Inc. v. Tropicana Prods. Inc.*, 846 F.2d 848, 851 (2d Cir.1988))); *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 654 F.Supp. 1195, 1200 (N.D.N.Y.1987); *Mazzola*, 363 A.2d at 173. Cf. *Riesbeck Food Markets, Inc. v. United Food and Commercial Workers*, 185 W.Va. 12, 404 S.E.2d 404, *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

In the event a court determines that an administrative agency has primary jurisdiction, the court will not necessarily refrain from deciding the case. *Woodlands Tele. Corp. v. A T & T*, 447 F.Supp. 1261, 1267

---

5. See, e.g., *Harrison v. Davis*, 197 W.Va. 651, 478 S.E.2d 104 (1996) (fraudulent concealment); *State ex rel. McGraw v. Scott Runyan Pontiac–Buick*, 194 W.Va. 770, 461 S.E.2d 516 (1995) (consumer credit and protection); *Adkins v. Inco Alloys Int'l, Inc.*, 187 W.Va. 219, 417 S.E.2d 910 (1992) (good faith and fair dealing); *State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 188 W.Va. 501, 425 S.E.2d 177 (1992) (antitrust); *Bowling v. Ansted Chrysler Plymouth–Dodge*, 188 W.Va. 468, 425 S.E.2d 144 (1992) (fraud); *USF & G v. Eades*, 150 W.Va. 238, 144 S.E.2d 703 (1965)

(money had and received). See also *W.Va.Code*, 47–18–9 [1978] and 47–18–13 [1978] of the West Virginia Antitrust Act; *W.Va.Code*, 46A–6–106 [1974] of the West Virginia Consumer Credit and Protection Act.

6. Indeed, the terms "primary jurisdiction" and "exhaustion of remedies," though separate and distinct legal concepts, are often confused and used interchangeably. See *Daily Advertiser*, 612 So.2d at 27 n. 31.

(S.D.Tex.1978) (*citing United States v. Phila-delphia National Bank*, 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963) and 3 K. Davis, *Administrative Law Treatise* § 19.01 at 3 (1958)). Rather, the court's jurisdiction is only postponed, *id.*, and " 'the case comes back in a suitable way for the Court, as a Court, to act.' " *American Trucking Associations, Inc. v. I.C.C.*, 682 F.2d 487, 492 (5th Cir.1982) (citation omit-ted). *See* 73 C.J.S. *Public Administrative Law and Procedure* § 37 at 437. ("The pri-mary jurisdiction doctrine is not technically a question of jurisdiction, but rather a matter of judicial self-restraint[.]" (footnotes omit-ted)).

Moreover, because there is no " 'fixed for-mula' " to determine whether the primary jurisdiction doctrine should be applied, "each case must be examined individually to deter-mine whether it would be aided by the doc-trine's application." *Penny v. Southwestern Bell Telephone Co.*, 906 F.2d 183, 187 (5th Cir.1990) (citation omitted). *See Oasis Pe-troleum*, 718 F.2d at 1564; *Delaware & Hud-son Ry. Co.*, 654 F.Supp. at 1200. Thus, a court's decision to submit or not to submit an issue for initial determination by an adminis-trative agency is reviewed on appeal under an abuse of discretion standard. *See Puerto Rico Maritime Shipping Authority v. Valley Freight Systems, Inc.*, 856 F.2d 546, 549 (3d Cir.1988); *Northern California District Council of Hod Carriers v. Opinski*, 673 F.2d 1074, 1075 (9th Cir.1982); *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1377 (10th Cir.1989).

■■■ We hold that where an administra-tive agency and the courts have concurrent jurisdiction of an issue which requires the agency's special expertise and which extends beyond the conventional experience of judges, the doctrine of primary jurisdiction applies. In such a case, the court should refrain from exercising jurisdiction until af-ter the agency has resolved the issue. The court's decision to apply or not to apply the primary jurisdiction doctrine is reviewed on appeal under an abuse of discretion standard.

■■■ In determining whether to apply the primary jurisdiction doctrine, courts have considered the following factors: "(1) wheth-er the question at issue is within the conven-tional experience of judges; (2) whether the question at issue lies peculiarly within the agency's discretion or requires the exercise of agency expertise; (3) whether there exists a danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *Oasis Petroleum*, 718 F.2d at 1564 (*citing e.g., Nader v. Allegheny Air-lines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Far East Conference, supra; American Trucking Associations, Inc. v. I.C.C.*, 682 F.2d 487 (5th Cir.1982); *Transway Corp. v. Hawaiian Express Ser-vice*, 679 F.2d 1328 (9th Cir.1982); *New Mex-ico Association for Retarded Citizens v. State of New Mexico*, 678 F.2d 847 (10th Cir.1982)).

■■■ BA–WV argues that the PSC is the proper entity to adjudicate the issues in this case, at least initially, under syllabus point one of *State ex rel. C & P Telephone Co. v. Ashworth*, 190 W.Va. 547, 438 S.E.2d 890 (1993), in which we held that "*W.Va.Code,* 24–4–7 [1923] confers concurrent jurisdiction on the Public Service Commission and the circuit court in a limited number of cases—namely, those cases seeking a refund based on rules and practices of the Public Service Commission that are clear and unambigu-ous." *Id.* in relevant part.[7]

In *Ashworth, supra,* a hospital sought a refund of more than $100,000 from the tele-phone company for a five-year period during which the hospital alleged it was overcharged for its telephone lines. The hospital argued its suit was a "simple refund case" within the circuit court's jurisdiction or, in the alterna-

---

7. *W.Va.Code,* 24–4–7 [1923] provides, in perti-nent part:

Any person, firm or corporation claiming to be damaged *by any violation of this chapter* by any public utility subject to the provisions of this chapter, may make complaint to the com-mission, as provided herein, and bring suit in

his own behalf for the recovery of the damages for which such public utility may be liable under this chapter in any circuit court having jurisdiction.

(emphasis added). We note that plaintiffs do not allege that petitioners have violated the provi-sions of the PSC Act.

tive, "a refund case relying on clear and unambiguous PSC rules and practices that also can be decided by the circuit court." *Id.*, 190 W.Va. at 551, 438 S.E.2d at 894. *See Id.* at syl. pt. 1, 438 S.E.2d 890. C & P argued, however, that the case involved "interpretations of its tariff for which the special competence of the PSC is required." *Id.*, 190 W.Va. at 551, 438 S.E.2d at 894. This Court applied the primary jurisdiction doctrine in *Ashworth,* concluding that the case, which presented "unusual and technical questions of tariff interpretation or application," "raise[d] policy issues that should be considered by the PSC in the interest of a uniform and expert administration of the public utilities' regulatory scheme." *Id.*

BA–WV contends that deference to the PSC in this case would likewise promote the "interest of a uniform and expert administration" of the regulatory scheme under which the state's largest telecommunications company operates. *See Id.* Indeed, the PSC exercised its regulatory expertise when it expressly approved the "negative option," or "opt-out" feature at issue in this case. In approving the optional wire maintenance plan, the PSC indicated its belief that

> the unbundling of the maintenance service is reasonable and is not detrimental to C & P's customers in any way. If we rejected the plan, the substantial revenue estimated to be generated by the [monthly optional wire maintenance] charge would not be available and therefore these dollars would be spread to all customers in C & P's base rates.

73 ARPSCWV at 772. *See* n. 3, *supra.*

Though BA–WV maintains that, in fact, the PSC has been using the revenues from inside wire maintenance charges "to hold down BA–WV's basic rates, which it has lowered under BA–WV's successive Incentive Regulation Plans[,]" plaintiffs challenge this contention. Plaintiffs' expert indicates that there is no evidence that revenues from inside wire maintenance have been used to subsidize lower regulated rates. Whether inside wire maintenance revenues have or have not subsidized basic rates is, BA–WV urges, a question more appropriately considered by the PSC. BA–WV further asserts

that to allow the circuit court to adjudicate matters concerning inside wire maintenance service rates and practices, without the benefit of the PSC's uniform and expert administration, would upset the carefully-balanced regulatory scheme of which inside wiring is only a part.

In contrast, plaintiffs argue that the circuit court correctly determined that the primary jurisdiction doctrine is not applicable in this case and thus, properly declined to refer it to the PSC in the first instance. Plaintiffs challenge BA–WV's insistence that when the PSC approved the detariffing of inside wire maintenance service, it also purportedly retained jurisdiction to regulate such services. *See [PSC] Order,* Case No. 90–613–T–PC, 1991 WL 519803, *supra.* Indeed, the trial court was not persuaded by BA–WV's contentions, noting its failure to prove that the PSC has, in fact, exercised any regulatory authority with regard to inside wire maintenance services. *See* conclusion of law no. 14 of BA–WV order.

Though the trial court acknowledged the existence of one formal and twenty informal complaints before the PSC regarding inside wiring, the court found that these complaints did not constitute *regulation* of inside wire maintenance services. Rather, the formal complaint "involved a charge to a customer to repair inside wiring work by a customer whose rewiring resulted in the disruption of a third party's service[.]" Finding of fact no. 9, in part, of BA–WV order. This inside wire issue, the trial court found, was "clearly distinguishable from the plaintiffs' current complaints." *Id.* The trial court further found that the informal complaints, "which are received and processed by the PSC at the staff level constitute an effort to *mediate* the dispute between the utility and the customer and explicitly do not constitute an adjudication of the customer's claim *let alone regulation of [inside wire maintenance services].*" *Id.* (citation omitted and emphasis added).

Plaintiffs allege that petitioners' activities with respect to the inside wire maintenance service plans violate this state's antitrust and consumer protection laws and also constitute, among other things, fraud. As previously indicated, circuit courts routinely adjudicate

such matters, *see* n. 5, *supra*, while, as the trial court indicated, issues of antitrust, for example, are only one factor administrative agencies consider in their regulation of an industry or practice. Conclusion of law no. 5 of BA–WV order (*citing Radio Corp. of America*, 358 U.S. at 351, 79 S.Ct. at 467). *See Delaware & Hudson Ry. Co.*, 654 F.Supp. at 1202 ("Although [an administrative agency] may consider antitrust principles in its determinations, the agency lacks authority to enforce the antitrust laws or even determine if they have been violated." (citations omitted)).

We agree with plaintiffs that the antitrust and consumer protection issues presented in this case, as well as the various common law claims, are well within the conventional experience of the circuit court. We are convinced that the court, without the PSC's assistance, will be well able to determine whether petitioners acted fraudulently or in violation of antitrust and consumer protection laws in the course of offering the inside wire maintenance service plans through a "negative option." The PSC's specialized knowledge in the area of inside wiring would not be of particular assistance to the circuit court in this case. We are likewise not persuaded by BA–WV's assertions that the PSC's purported regulation of inside wiring would be disrupted by the circuit court's adjudication of alleged deceptive and fraudulent sales schemes. We therefore conclude that the circuit court properly declined to apply the primary jurisdiction doctrine in this case and thus, appropriately denied BA–WV's 12(b)(1) motion to dismiss.

### III.

Petitioner Bell Atlantic Corporation, a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania, seeks to prohibit enforcement of the circuit court's July 30, 1996 order which denied its motion to dismiss for lack of personal jurisdiction. *See W.Va.R.Civ.P.* 12(b)(2).

In syllabus point five of *Abbott v. Owens–Corning Fiberglas Corp.*, 191 W.Va. 198, 444 S.E.2d 285 (1994), this Court, relying, *inter alia*, on *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 290, 100 S.Ct. 559, 563, 62 L.Ed.2d 490, 496–97 (1980), set forth a two-part analysis for determining whether a circuit court has personal jurisdiction over a nonresident defendant or foreign corporation:

A court must use a two-step approach when analyzing whether personal jurisdiction exists over a foreign corporation or other nonresident. The first step involves determining whether the defendant's actions satisfy our personal jurisdiction statutes set forth in *W.Va.Code*, 31–1–15 [1984] and *W.Va.Code*, 56–3–33 [1984]. The second step involves determining whether the defendant's contacts with the forum state satisfy federal due process.

*See* syl. pt. 1, *Lane v. Boston Scientific Corp.*, 198 W.Va. 447, 481 S.E.2d 753 (1996).

This state's primary long-arm statute, *W.Va.Code*, 56–3–33(a) [1984], confers *in personam* jurisdiction on a nonresident who engages in any one of seven acts enumerated therein:

(1) Transacting any business in this State;

(2) Contracting to supply services or things in this State;

(3) Causing tortious injury by an act or omission in this State;

(4) Causing tortious injury in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;

(5) Causing injury in this State to any person by breach of warranty expressly or impliedly made in the sale of goods outside this State when he might reasonably have expected such person to use, consume or be affected by the goods in this State: Provided, That he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;

(6) Having an interest in, using or possessing real property in this State; or

(7) Contracting to insure any person, property or risk located within this State at the time of contracting.

*See Abbott,* 191 W.Va. at 207, 444 S.E.2d at 294; *Lane,* 198 W.Va. at 450–51, 481 S.E.2d at 756–57.

West Virginia's second long-arm statute, *W.Va.Code,* 31–1–15 [1984], which elaborates on the "transacting business" provision of *W.Va.Code,* 56–3–33(a) [1984], *supra,* is directed specifically at foreign corporations:

> For the purposes of this section, a foreign corporation not authorized to conduct affairs or do or transact business in this State pursuant to the provisions of this article shall nevertheless be deemed to be conducting affairs or doing or transacting business herein (a) if such corporation makes a contract to be performed, in whole or in part, by any party thereto, in this State, (b) if such corporation commits a tort in whole or in part in this State, or (c) if such corporation manufactures, sells, offers for sale or supplies any product in a defective condition and such product causes injury to any person or property within this State notwithstanding the fact that such corporation had no agents, servants or employees or contacts within this State at the time of said injury.

*Id.,* in relevant part. *See Abbott,* 191 W.Va. at 207, 444 S.E.2d at 294; *Lane,* 198 W.Va. at 451, 481 S.E.2d at 757.

In determining whether a circuit court may exercise *in personam* jurisdiction over a foreign corporation such as BAC, both *W.Va. Code,* 31–1–15 [1984], *supra,* and *W.Va.Code,* 56–3–33 [1984], must be considered. *Abbott,* 191 W.Va. at 207, 444 S.E.2d at 294. *See Lane,* 198 W.Va. at 450 n. 6, 481 S.E.2d at 756 n. 6.

■ When a nonresident defendant makes a motion to dismiss for lack of personal jurisdiction under *W.Va.R.Civ.P.* 12(b)(2), it is the plaintiff's burden to establish sufficient facts upon which a court may exercise jurisdiction over such defendant under the applicable personal jurisdiction statutes. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989); *O'Connor, Cavanaugh v. Bonus Utah, Inc.,* 156 Ariz. 171, 750 P.2d 1374, 1376 (Ct.App.

1988); *Knipple v. Viking Communications, Ltd.,* 236 Conn. 602, 674 A.2d 426, 429 (1996); *Conley v. Boyle Drug Co.,* 570 So.2d 275, 288 (Fla.1990); *Phelps v. Kingston,* 130 N.H. 166, 536 A.2d 740, 742 (1987); *White v. Stephens,* 300 S.C. 241, 387 S.E.2d 260, 262 (1990). *See Lane,* 198 W.Va. at 451, 481 S.E.2d at 757.

When ruling on a Rule 12(b)(2) motion to dismiss, the circuit court may resolve the personal jurisdiction issue either upon the pleadings, affidavits and other documentary evidence or through a pretrial evidentiary hearing or, alternatively, it may permit discovery to aid in its decision. *Combs,* 886 F.2d at 676; *Market/Media Research v. Union–Tribune Pub. Co.,* 951 F.2d 102, 106 (6th Cir.1991), *cert. denied,* 506 U.S. 824, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992); *PanAmerican Mineral Services v. KLS Enviro Resources, Inc.,* 916 P.2d 986, 989 (Wyo.1996). *See CutCo Industries, Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). *See also Lane,* 198 W.Va. at 451–52, 481 S.E.2d at 757–58.

In the event the circuit court conducts a full evidentiary hearing on the personal jurisdiction issue or the issue is litigated at trial, the party asserting personal jurisdiction must prove such jurisdiction by a preponderance of the evidence. *Combs,* 886 F.2d at 676; *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 587 n. 3 (9th Cir.1993); *Northern Tankers (Cyprus) Ltd. v. Backstrom,* 901 F.Supp. 72, 77 (D.Conn.1995); *Robinson v. U–Haul International, Inc.,* 929 P.2d 1236, 1238 (Wyo. 1997); *Doe v. Roman Catholic Diocese of Boise,* 121 N.M. 738, 918 P.2d 17, 21 (Ct. App.), *cert. denied,* 121 N.M. 693, 917 P.2d 962 (1996) (*citing, e.g.,* 21 James Wm. Moore, *Moore's Federal Practice,* ¶ 12.07, at 12–70 to 12–72 (2d ed. 1995)).

On the other hand, when a court considers a nonresident defendant's Rule 12(b)(2) motion "only on the motion papers, supporting legal memoranda, affidavits, other documents, and the relevant allegations of the complaint, the burden on the plaintiff is to make a mere *prima facie* showing of jurisdiction to survive the jurisdictional challenge." *Clark v. Milam,* 830 F.Supp. 316, 319 (S.D.W.Va.1993) (*citing, e.g., Combs,* 886

F.2d at 676). *See CutCo Industries,* 806 F.2d at 365; *Fields v. Sedgwick Associated Risks,* 796 F.2d 299, 301 (9th Cir.1986); *Doe,* 918 P.2d at 21; *IBM v. Martin Prop. & Cas. Ins. Agency,* 281 Ill.App.3d 854, 217 Ill.Dec. 197, 199, 666 N.E.2d 866, 868 (1996). *See also Lane,* 198 W.Va. at 452, 481 S.E.2d at 758. Where a court permits the parties to conduct discovery on the jurisdiction issue, the party asserting jurisdiction must likewise make a *prima facie* showing of jurisdiction. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996); *Rano,* 987 F.2d at 587 n. 3. In determining whether a party has made a *prima facie* showing of personal jurisdiction, the court must view the allegations in the light most favorable to the plaintiff, drawing all inferences in favor of jurisdiction. *See Mylan Laboratories, Inc. v. Akzo, N.V.,* 2 F.3d 56, 62 (4th Cir.1993); *American Greetings Corp. v. Cohn,* 839 F.2d 1164, 1169 (6th Cir.1988). *See generally* 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure,* § 1351 (1990). *See also Lane,* 198 W.Va. at 452, 481 S.E.2d at 758.

When a nonresident defendant files a Rule 12(b)(2) motion, thereby challenging the existence of personal jurisdiction, and offers "affidavits or depositions, ... the party resisting such motion may not stand on its pleadings [but] must come forward with affidavits or other proper evidence detailing specific facts demonstrating that the court has jurisdiction over the defendant." *Doe,* 918 P.2d at 21. *See Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 (3d Cir.1984); *Morgan v. Morgan,* 679 So.2d 342, 346 (Fla.Ct.App.1996). *See also Lane,* 198 W.Va. at 452, 481 S.E.2d at 758.

In this case, the circuit court apparently considered petitioner BAC's motion to dismiss for lack of personal jurisdiction on the pleadings, affidavits and other documentary evidence.[8] Thus, in order to survive BAC's

jurisdictional challenge, plaintiffs were required to establish a *prima facie* case of personal jurisdiction.

▮▮▮ We conclude that when a defendant files a motion to dismiss for lack of personal jurisdiction under *W.Va.R.Civ.P.* 12(b)(2), the circuit court may rule on the motion upon the pleadings, affidavits and other documentary evidence or the court may permit discovery to aid in its decision. At this stage, the party asserting jurisdiction need only make a *prima facie* showing of personal jurisdiction in order to survive the motion to dismiss. In determining whether a party has made a *prima facie* showing of personal jurisdiction, the court must view the allegations in the light most favorable to such party, drawing all inferences in favor of jurisdiction. If, however, the court conducts a pretrial evidentiary hearing on the motion, or if the personal jurisdiction issue is litigated at trial, the party asserting jurisdiction must prove jurisdiction by a preponderance of the evidence.

▮▮▮ Under step one of the two-step analysis articulated in syllabus point five of *Abbott, supra,* plaintiffs were required to establish that the actions of BAC, a nonresident and a foreign corporation, satisfied *W.Va. Code,* 56-3-33(a) [1984] and *W.Va.Code,* 31-1-15 [1984], our personal jurisdiction statutes.

With regard to the personal jurisdiction issue, plaintiffs alleged that BA-WV is a wholly-owned subsidiary of BAC. Though BAC admits that it, in fact, owns the BA-WV stock, Jane F. Ludlow, Assistant Secretary of BAC, states, in a sworn affidavit, that BAC and BA-WV are two separate and distinct corporations and that BAC owns no real or personal property in West Virginia. *See W.Va.Code,* 56-3-33(a)(6) [1984], *supra.* Ms. Ludlow further indicates that BAC has no offices in West Virginia and that it conducts

---

**8.** Though proceedings on the motions to dismiss were conducted on March 26, 1996, only three pages from the forty-five page transcript were submitted for this Court's review. It is therefore unclear to what extent the issues in this appeal were presented and argued at that proceeding. The parties indicate and the three-page hearing transcript excerpt reflects that, at the conclusion of the proceeding, the court permitted the parties to conduct discovery on the jurisdictional issues for a sixty-day period. According to BAC, plaintiffs failed to conduct any jurisdictional discovery during that period. In any case, the parties do not indicate that a full evidentiary hearing was ever conducted on the personal jurisdiction issue.

no business here. Finally, Ms. Ludlow states that BAC's connection to West Virginia is limited to its ownership of the BA–WV stock.

Plaintiffs maintain, however, that, according to the local telephone directory, submitted below as part of plaintiffs' documentary evidence, the name "Bell Atlantic" is a registered trademark of Bell Atlantic Corporation and further, that one of the inside wire maintenance plans presently at issue, the Bell Atlantic Guardian Plan, is also denoted as a BAC registered trademark. In addition, the local telephone directory indicates that it is not only published by "Bell Atlantic," making no reference to BA–WV, but it also makes numerous references to "Bell Atlantic" as the company providing telephone service to West Virginia customers.

Plaintiffs also presented excerpts of West Virginia and Maryland telephone directories, both of which are published by "Bell Atlantic" and both of which describe their respective inside wire maintenance plans. A comparison of the texts of these Bell Atlantic inside wire maintenance plans reveals that they are virtually identical. Plaintiffs contend that this parity suggests that BAC is, in fact, responsible for the inside wire maintenance services offered in West Virginia.

According to plaintiffs, in prior proceedings before the FCC regarding proposed measures for the cooperation between the FCC and the states in promoting the development of a competitive market for simple inside wiring services, the "Bell Atlantic Telephone Companies" jointly filed comments, *see* 7 FCC Rcd 1334 (1991) (Third Report and Order), demonstrating, at least *prima facie*, a collaboration among BAC and its subsidiaries with regard to inside wire.

Finally, plaintiffs point to the case of *Bell Atlantic Corporation v. Bolger*, 2 F.3d 1304 (3d Cir.1993), in which BAC shareholders objected to court approval of a derivative lawsuit settlement of $40 million which resolved allegations that Bell of Pennsylvania "violated state unfair practices and consumer protection laws by misleading sales practices which induce customers to purchase superfluous 'inside wire' maintenance and service plans." *Id.*, 2 F.3d at 1306 n. 2. In the course of upholding the settlement agreement, which "required the parent corporation to institute internal mechanisms to prevent improper sales and marketing methods[,]" the United States Court of Appeals for the Third Circuit indicated that the underlying settlement agreement reflects "how ... the parent corporation [BAC] will obey the law and provides specific mechanisms to ensure employees of Bell Atlantic and all its subsidiaries behave appropriately." *Id.*, 2 F.3d at 1310, 1312.

In syllabus point two of *Norfolk Southern Ry. Co. v. Maynard*, 190 W.Va. 113, 437 S.E.2d 277 (1993), we held:

> A parent-subsidiary relationship between corporations, one of which is 'doing business' in West Virginia, does not without the showing of additional factors subject the nonresident corporation to this state's jurisdiction. However, if the parent and its subsidiary operate as one entity, their formal separate corporate structures will not prevent the assertion of jurisdiction over the non-resident corporation. The extent of control exercised by the non-resident corporation over the corporation doing business in this state determines whether the non-resident corporation is subject to this state's jurisdiction.

*See Southern Electrical Supply Co. v. Raleigh County National Bank*, 173 W.Va. 780, 787, 320 S.E.2d 515, 522 (1984) (" 'Justice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong.' " (citation omitted)). Determination of whether such nonresident corporation, "whose subsidiary is present in this state, is subject to the jurisdiction of this state's courts must be made on a case by case basis." *Norfolk Southern*, 190 W.Va. at 118, 437 S.E.2d at 282.

Based upon the facts presented and looking beyond the petitioners' "formal separate corporate structure," *id*, to the extent they have been presented, it is difficult to discern where BA–WV's activities stop and BAC's begin. Construing plaintiffs' allegations in the light most favorable to them, plaintiffs

have made a *prima facie* showing that BAC is transacting business in this State under *W.Va.Code*, 56–3–33(a)(1) [1984] and that BAC has committed a tort in whole or in part in this State, *W.Va.Code*, 31–1–15(b) [1984], satisfying the first step of our personal jurisdiction analysis.[9] *See Abbott, supra.*

▮▮▮▮▮ The second step in determining whether personal jurisdiction exists over BAC involves determining whether BAC's contacts with West Virginia satisfy federal due process. *Abbott*, at syl. pt. 5, 444 S.E.2d 285, *supra.* In syllabus point one of *Norfolk Southern, supra,* we reiterated that

' "[t]he standard of jurisdictional due process is that a foreign corporation must have such minimum contacts with the state of the forum that the maintenance of an action in the forum does not offend traditional notions of fair play and substantial justice." Syllabus Point 1, *Hodge v. Sands Manufacturing Company*, 151 W.Va. 133, 150 S.E.2d 793 (1966).' Syllabus Point 1, *Hill by Hill v. Showa Denko, K.K.*, 188 W.Va. 654, 425 S.E.2d 609 (1992), *cert. denied*, [508] U.S. [908], 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993).

In *Norfolk Southern, supra,* we indicated that "[t]he critical element for determining minimum contacts is not the volume of activity but rather 'the quality and nature of the activity in relation to the fair and orderly administration of the laws.' " *Id.*, 190 W.Va. at 116, 437 S.E.2d at 280 (*quoting International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945)). We further stated that " 'the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court

there.' " *Id.* (*quoting Hill by Hill*, 188 W.Va. at 657, 425 S.E.2d at 612 and *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d 490 (1980)). *See Pries v. Watt*, 186 W.Va. 49, 51, 410 S.E.2d 285, 287 (1991) ("an essential element of the minimum contacts is whether the defendant's activities are such that it is reasonable and fair to subject him to suit in the forum state, a determination that must be made on the particular facts of each case." (*citing Kulko v. Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978))).

As stated above, plaintiffs' allegations are to be construed in the light most favorable to them. According to the local telephone directory, it is published by "Bell Atlantic," a registered trademark of BAC. "Bell Atlantic" is further referred to as the company providing telephone services to West Virginia customers. Furthermore, the "Bell Atlantic Telephone Companies" filed joint comments with the FCC in proceedings regarding the development of a competitive inside wiring maintenance services market. Finally, the names of the inside wire maintenance service plans offered by BA–WV are registered trademarks of BAC. Considering that plaintiffs' complaint concerns the allegedly fraudulent and deceptive sale and marketing of these inside wire maintenance service plans in West Virginia and, construing plaintiffs' allegations in the light most favorable to them, plaintiffs have made a *prima facie* showing[10] that BAC's conduct and connection with West Virginia are such that it should reasonably anticipate being haled into our courts. *See Norfolk Southern*, 190 W.Va. at 116, 437 S.E.2d at 280. Furthermore, maintenance of this action does not offend traditional notions of fair play and substantial justice. *See Id.*, at syl. pt. 1, 437 S.E.2d 277.

9. As we previously stated, though a plaintiff who makes a *prima facie* showing of personal jurisdiction will survive a *W.Va.R.Civ.P.* 12(b)(2) motion to dismiss at the pretrial stage, we note that plaintiffs must ultimately demonstrate jurisdiction, either at trial or at a full evidentiary hearing, by a preponderance of the evidence. *See CutCo Industries*, 806 F.2d at 365; *Marine Midland Bank*, 664 F.2d at 904.

10. We reiterate that, at this pretrial stage, where the court considers only "the motion papers, supporting legal memoranda, affidavits, other documents, and the relevant allegations of the complaint, the burden on the plaintiff is to make a mere *prima facie* showing of jurisdiction" to survive a Rule 12(b)(2) motion to dismiss. *Clark*, 830 F.Supp. at 319. Either at trial or at a full evidentiary hearing, plaintiffs will be required to prove personal jurisdiction by a preponderance of the evidence. *See Combs*, 886 F.2d at 676.

For the above-stated reasons, we find that the circuit court[11] properly denied BAC's 12(b)(2) motion to dismiss.[12]

## IV.

In syllabus point 4 of *Pries, supra,* we reiterated the standard under which a writ of prohibition will issue: "'A writ of prohibition will lie where the trial court does not have jurisdiction or, having jurisdiction, exceeds its legitimate powers.' Syllabus Point 3, *State ex rel. McCartney v. Nuzum,* 161 W.Va. 740, 248 S.E.2d 318 (1978)."

As described above, the circuit court, having subject matter jurisdiction of this case, properly declined to apply the doctrine of primary jurisdiction and further, properly determined that plaintiffs established a *prima facie* case of personal jurisdiction over petitioner BAC. We, therefore, deny petitioners BA–WV and BAC's petition for a writ of prohibition.

Writ denied.

MAYNARD, J., dissents and reserves the right to file a dissenting opinion.

STARCHER, J., concurs and reserves the right to file a concurring opinion.

MAYNARD, Justice, dissenting:

(Filed July 17, 1997)

I respectfully dissent. I would grant the writ and compel the trial court to dismiss because I believe the Public Service Commission, *not* the trial court, has exclusive jurisdiction of inside wire maintenance agreements.

---

11. Petitioners argue that the circuit court failed to scrutinize the orders prepared by opposing counsel but instead, erroneously adopted "the long, often argumentative statements of successful counsel." *South Side Lumber Co. v. Stone Construction Co.,* 151 W.Va. 439, 443, 152 S.E.2d 721, 723 (1967). Petitioners offer no evidence tending to show the court's failure to scrutinize the order prepared by plaintiffs' counsel, however.

Plaintiffs maintain that although a draft of plaintiffs' proposed order was sent to petitioners' counsel, petitioners' counsel failed to object to any of the proposed findings. In that there is a presumption "that the court acted regularly ... and the burden is on the party alleging irregularity to show affirmatively that such irregularity exists[,]" *Kimball v. Walden,* 171 W.Va. 579, 581, 301 S.E.2d 210, 213 (1983), we find no merit in petitioners' unsupported allegations.

12. BAC also made a motion to dismiss on the ground that plaintiffs have failed to state a claim upon which relief can be granted, pursuant to *W.Va.R.Civ.P.* 12(b)(6). BAC now seeks a writ of prohibition to prohibit enforcement of the circuit court's order denying that motion. Based upon our holding in syllabus point two of *State ex rel. Arrow Concrete Co. v. Hill,* 194 W.Va. 239, 460 S.E.2d 54 (1995), in which we held that "[o]rdinarily the denial of a motion for failure to state a claim upon which relief can be granted made pursuant to *West Virginia Rules of Civil Procedure* 12(b)(6) is interlocutory and is, therefore, not immediately appealable[,]" we find BAC's argument, at this stage in the proceedings, to be without merit.