381 So.2d 719 (1980)
ATLANTIC INTERNATIONAL INVESTMENT CORPORATION, Appellant,
v.
John W. TURNER, Jr., Volusia County Property Appraiser, and Robert D. Summers, As Director of the Revenue Division of Volusia County, Florida, Appellees.
No. KK-196/NT1-10.
District Court of Appeal of Florida, Fifth District.
January 9, 1980.
As Corrected On Denial of Rehearing March 4, 1980.
*720 Guyte McCord, III, of Spector & Tunnicliff, Tallahassee, for appellant.
William M. Barr of Raymond, Wilson, Conway, Barr & Burrows, Tallahassee, for appellees.
BOOTH, Judge.
This cause is before us on appeal from the order of the Circuit Court, Volusia County, upholding the 1976 ad valorem tax assessment on acreage owned by appellant.
The facts are that the property was originally purchased in 1967 and 1968, divided on paper into more than 5,000 parcels and registered with the Florida Land Sales Board. By 1971, some 90% of the land had been sold under contracts for deeds, which contracts provided that an extensive system of drainage and graded dirt roads would be constructed by 1973. However, difficulties were encountered following the abolition of the South County Drainage District, which had theretofore been contractually responsible *721 for construction of the graded dirt roads and drainage system on the property. In 1971, the Department of Pollution Control was empowered by the Legislature to require permits for construction and operation of water pollution sources. Appellant's project was presented to the Department of Pollution Control in June of 1972, but the Department refused to take any action while litigation concerning the South County Drainage District was pending. In 1973 an agreement was reached between appellant and Volusia County concerning the transfer of functions and responsibilities of the former South County Drainage District, and in September of 1974, appellant filed a formal application for a permit with the Department of Pollution Control. This was required because roads and drainage projects already undertaken by appellant were considered to be "pollution sources" by the Department of Pollution Control. On November 6, 1974, the Department of Pollution Control, by letter from the regional engineer of the Orlando office, denied appellant's permit application. Administrative review of the denial of appellant's permit application was pursued and the matter was eventually settled by stipulation between the parties in June of 1977.
The question presented is whether the tax assessor, in determining the assessment for the year 1976 properly considered the moratorium on development or improvement of the property as required by Florida Statute § 193.011, which provides, in pertinent part, as follows:
"193.011 Factors to consider in deriving just valuation
In arriving at just valuation as required under s. 4, Art. VII of the State Constitution, the property appraiser shall take into consideration the following factors:
* * * * * *
(2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration any applicable local or state land use regulation and considering any moratorium imposed by executive order, law, ordinance, regulation, resolution, or proclamation adopted by any governmental body or agency or the Governor when the moratorium prohibits or restricts the development or improvement of property as otherwise authorized by applicable law." (e.s.)
Specifically, the question presented is whether the tax assessor properly interpreted subsection (2) of § 193.011. Under the foregoing statute, the assessor was required to consider the highest and best use to which the property could be put on January 1, 1976 and "in the immediate future," taking into consideration any regulations and moratoriums which "prohibit or restrict development or improvements." The highest and best use in the immediate future, refers to a use which is "expected immediately." Lanier v. Overstreet, 175 So.2d 521 (Fla. 1965).
The present use of the property on the assessment date was, according to the landowner's evidence, for a hunting and fishing preserve. The land was largely unusable for other purposes due to lack of drainage and access roads. On January 1, 1976, development was at a standstill and there was the potential of 5,000 lawsuits from irate purchasers due to the three-year delay of improvements contracted for by appellant, which improvements required permits.
On January 1, 1976, there had been only one resale of the property, a refund by appellant of a purchaser's money in an effort to avoid a lawsuit. There was no income from the property and permit applications for further development had been rejected by the Department of Pollution Control. The sole existing canal on the land was unconnected to a drainage area and survey and survey markers on the land were directly related to the development which was still awaiting government approval.
Concerning appellee's consideration of § 193.011(2), the testimony of the Volusia County property evaluator supervisor, Frank DeBartolo, is, in pertinent part, as follows:

*722 "Q [B]ut assume that on January 1, 1976 through the refusal of the State to issue necessary permits, a prospective buyer of one of these tracts would have no assurance that he could use this land for anything other than as its being used now in its natural state. Is it your judgment that he would have been willing to pay $700 an acre for that piece of property?
A You made some assumption that I of course don't make with you.
Number one is that you are not going to get the  can't get the approval. See, I have been  I haven't been able  our department hasn't been able to feel that way yet ...
* * * * * *
Q ... The question is simply this: In regard to the 1976 assessments that we're talking about here, did you consider there was or was not a moratorium as of January 1, 1976 as defined by this statute?
A We considered this  this delay problem  whatever you want to  you're calling it a moratorium... . But in any event this delay, this problem, which we've talked about been testified to, definitely was considered in the early 76 or as of the date of the assessment ... We did consider it and the only adjustment we made on that overall subdivision was to the other purchasers, your purchasers, not to the corporation because we felt that value was conservative enough that it reflected the problem.
* * * * * *
A ... [W]e knew it  that you were having problems on a delay. And rest assured you're not the only one with problems of this general nature. I don't know about your specific problems. So we were aware of it and some of your purchasers had notified us that your client had told them they couldn't pursue because of problems with state, local, county and all, I don't know ... We surely did not feel at that time and don't today that this is a  its done, its finished, its absolutely gone busted, whatever language you want to use; maybe moratorium is the proper name, legally. And therefore everything is collapsed. No. We don't believe that's happened yet. Now I don't know what the future holds for your subdivision . .." (e.s.)
In the foregoing testimony, the assessor assumes that approval for development will ultimately be obtained, admits he didn't know appellant's specific problem, but states that the development is not "done," "finished," "absolutely gone busted," or collapsed, the moratorium factor results in no reduction in the assessed value.
This property was assessed as "speculation land of A-1 property" described as "undeveloped land speculation subdivision," and $700 to $800 per acre with no reduction for the moratorium factor. This assessment admittedly required speculation that appellant would eventually receive the needed permits and that the property could be made useable in something other than its wild state. Subsequent history of the property has revealed how speculative the assessment was on the assessment date, since the permitting problems were only resolved by court settlement some two years later.
The use of private property is increasingly subject to government regulation in the public interest to protect the environment and guard against thoughtless development. In 1974, the Legislature, in recognition of this increased regulation and its burden, amended § 193.011(2) to specifically require that property appraisers consider government moratoriums affecting development in arriving at a just valuation for tax purposes. Basic concepts of fairness, as well as principles of property appraisal, preclude valuation for tax purposes without due consideration of the governmental restrictions on use of the property to be taxed. Thus, even prior to the 1974 amendment, zoning regulations applicable on the taxable date were required to be considered in determining the highest and best use of the property. Straughn v. Tuck, 354 So.2d 368 (Fla. 1977).
*723 The Florida Supreme Court, in Straughn v. Tuck, supra, held the tax assessor must consider each factor in § 193.011, holding:
"[T]he tax assessor in this case failed to consider the `present use' of appellees' property, in determining the `highest and best use' to which the property could be expected to be put in the `immediate future.' Section 193.011(2). Rather, he valued it by subjective standards, using speculative factors, assuming there would be a zoning change and the land converted to a more intensive use ... The uses under the statute must be immediate, not speculative, and not predicated on conversion to higher or better uses ..."
In Straughn v. Tuck, the court found that the assessment of unimproved land zoned agricultural based on the assessor's speculation that zoning could be changed to allow a more intensive use was improper and failed to take into account the factor of the statute requiring determination of present use and highest and best use in the "immediate future." In Williams v. Simpson, 209 So.2d 262 (Fla. 1st DCA 1968), this Court set aside an appraisal based on the "ultimate potential" of the property, citing the rule of the Florida Supreme Court in Lanier v. Overstreet, 175 So.2d 521 (Fla. 1965), holding:
"By authorizing tax assessors to consider, as one of the factors `[i]n arriving at a just valuation' of property, the use to which the property `can be expected to be put in the immediate future' (emphasis added), the Legislature has, under the familiar rule of expressio unius est exclusio alterius, prohibited tax assessors from considering potential uses to which the property is reasonably susceptible and to which it might possibly be put in some future tax year or, even, during the current tax year. To be considered, the use must be expected, not merely potential or a `reasonably susceptible' type of use; it must be expected immediately, not at some vague uncertain time in the future ..." (emphasis theirs)
In the instant case the assessor testified that he "considered" the moratorium provision of the statute but his testimony reveals: (1) That he was unaware of the facts concerning the moratorium and (2) That he misconstrued the statutory provision to require that the proposed development be abandoned as of the January 1 date, or as he stated, "absolutely gone busted" in order for the provision to apply and (3) That he considered eventual rather than immediate future uses based on conjecture that the approval would be obtained.
A moratorium is by definition "a delay officially required;" "a suspension of activity;" "a temporary ban on the use ... of something."[1] In interpretation such as testified to by the assessor here requires a high degree of finality and permanence of restriction and prohibition of development before the moratorium factor can be given effect in making the assessment. This defeats the legislative intent to require consideration in each taxable year of governmental delays enjoined on the development and improvements of private property. Florida Statute 193.011 does not require that there be an abandonment of development or improvement of the property, but rather that there be a delay due to the causes specified. Here there was clearly such a delay, and its effect on the value of the property must be accurately taken into account.
Accordingly, we must remand this cause to the trial court for determination of the value of the property for its highest and best use in accordance herewith. REVERSED and REMANDED.
MELVIN, J., concurs.
LARRY G. SMITH, J., dissents.
LARRY G. SMITH, Judge, dissenting.
It is possible that the majority has misinterpreted the appellant landowner's evidence concerning the present use of the property, and in so doing, has been led to an erroneous view of the entire case. Appellant's witness, Mr. Johnson, testified:

*724 "Q. Mr. Johnson, in your opinion what do you consider or what did you consider to be the highest and best use of this property as of January 1, 1976?
"A. I think somebody might use it for a hunting preserve, the same as the Farmington area."
These statements do not constitute evidence that the "present use of the property", on the assessment date, was for a "hunting and fishing preserve" as stated in the majority opinion. It is clear, however, that Mr. Johnson failed to realistically evaluate the land for any useful purpose. He described it mostly as poor, swampy land; and there was "so much of it", that he did not know how it could be used even if roads were put in it. He further testified:
"Q. You say in your opinion that the highest and best use of this property as of January 1, 1976 was simply as a wild life refuge or as it is in its natural state?
"A. Right."
This witness' testimony was subject to other infirmities which will be referred to later.
The trial judge rejected, as he was empowered to do, the testimony of appellant's expert witness who could see no conceivable value in the property, except possibly for use in its raw, natural state, as a wildlife refuge, or as a hunting and fishing preserve. Opposed to this the remaining testimony, including that of the tax assessor's property appraiser, pointed to an established value for the land based upon its use for residential development, which, coincidentally, is the purpose for which it was bought by appellant some nine years previously. The evidence further discloses without any contradiction that the money and efforts of the developer have been continuously devoted to accomplishment of the purpose for which the property was purchased during the entire period of time from its purchase up to and including the assessment date  January 1, 1976.
It appears to me that the majority has merely "assumed" a reduction in value of the land because of the delay experienced by the developer in obtaining needed permits from the regulatory authority. However, no evidence was presented in the trial court to show the extent to which any delay in appellant's development plans was due to governmentally imposed restrictions, and to what extent the delay was attributable to appellant's delay, inadequate planning, engineering, or failure to devote the necessary financial resources to the construction of necessary improvements.
Here, appellant at all times fully understood the necessity of constructing suitable drainage and road facilities. Appellant was contractually bound to do so. The original plan was for appellant to advance the money for these improvements to the South County Drainage District, and to be repaid by the District's assessment of these costs against the subdivision lot purchasers. Obviously, appellant and the Department of Environmental Regulation disagreed on what improvements would be suitable. There is testimony, from appellant's vice president, that originally the estimated cost was approximately $110.00 per acre for these improvements, payable by the lot purchasers over a ten year period of time, commencing in 1980. He further testified that these estimated costs increased. But no testimony was presented to show that appellant was prevented from constructing suitable roads and drainage; only that it chose to submit an application that was not suitable, under rules and regulations enforced (and properly so, so far as this record shows) by the Department of Environmental Regulation. Had appellant chosen earlier to submit a different plan, there is no evidence to show that it would not have been acceptable, as a modified plan ultimately was. In fact, the matter was settled by negotiation and agreement, finalized in 1977.
It appears to me that the majority has misapplied the term "moratorium" in equating it with "governmental delay". The opinion defines moratorium as "a delay officially required"; a "suspension of activity"; or "a temporary ban on the use . . of something". The delay here was occasioned by appellant's failure to provide adequate *725 pollution control facilities under Chapter 403, Florida Statutes, so as to bring the project within the standards or rules promulgated by the Department of Environmental Regulation. Section 403.087, Florida Statutes. There is no basis in the record for a determination, as the majority apparently has done, that the statute, or any rules, regulations or standards adopted pursuant to the statute, were "temporary", or merely intended to "delay" any contemplated development. The regulations were permanent, to the same extent that any other law, rule or regulation is permanent. Obviously they are subject to change; but this case does not involve a matter of change of use brought about by a change in regulations, nor a delay of use for a particular purpose such as would be contemplated by the term "moratorium".
I have no quarrel with the majority's insistence that the extent to which land is subject to government regulation must be considered in determining its highest and best use. Straughn v. Tuck, 354 So.2d 368 (Fla. 1977). But I think the majority has misapplied this principle in this case, because the issue here was "value", not "highest and best use". There was no evidence before the trial court to support a ruling that the highest and best use of the property was other than the use to which it was being and had been devoted for some nine years. The fact that the roads and drainage required by state law proved more costly than the developer initially assumed surely is a factor bearing upon value. But the existence of such regulations does not preclude development or use of the land; they simply require that steps be taken to insure the health, welfare and safety of those using the land, as well as the public generally.
Here, appellant's proposed drainage and water control plan simply did not make adequate provision for the control of water pollution, and its application for a permit was denied for that reason. The fallacy of appellant's argument that it was delayed by a "moratorium" is shown by the fact that before trial of this proceeding appellant succeeded in obtaining the necessary permit, not by virtue of a change in the law, rules or regulations, but because of a modification of appellant's plan for construction and maintenance of drainage facilities on the property. Also, at least a part of the delay in arriving at a successful solution to the property's drainage problems can be attributed to appellant's initial error in planning under which the property was divided, on paper, into a "grid pattern", and lots were sold on that basis. This prevented normal use of topographical and other natural features of the land which would be utilized in a well planned development.
Furthermore, it should be noted that this case does not involve a question of the validity of any statute, rule or regulation under the Constitution or Laws of Florida. To the contrary, the parties here specifically stipulated before the administrative tribunal that such questions were beyond the scope of the administrative proceedings; and there is no evidence of appellant's attack upon any statute, rule or regulation by appropriate court action during this controversy.
The majority seems to assume, although it is not spelled out clearly in the revised opinion, that land which has a value for subdivision development, as appellant's land obviously has, must be considered as without value for that purpose when it becomes subject to state regulations requiring the drainage and road facilities to meet certain standards. Thus, the majority translates "regulation" as "moratorium", without requiring even the contention, much less proof, that the required standards are impossible, practically or economically, for any interested purchaser to meet.
Of course, any land use regulation, or change in zoning laws or regulations restricting use or prohibiting development for certain purposes for which it would otherwise be suitable, would have to be taken into account in determining "value". There are no such regulations or ordinances involved in this proceeding. The property was purchased in 1967 in its raw, undeveloped, natural state for $500.00 per acre. At *726 that time it was zoned A-1, "residential use", and this zoning has not changed. Even the testimony of appellant's witness makes it crystal clear that no one could conceivably contemplate development of the property into residential homesites without construction of roads and making provision for adequate drainage. However, no one testified that there was any basis or reason for suggesting that the property had less value, on January 1, 1976, without the necessary roads and drainage, than it had when purchased in 1967. There was no more reason to assume that suitable development could not be accomplished on January 1, 1976, by construction of adequate roads and drainage, than there was when the property was purchased in 1967, for $500.00 per acre.
The majority opinion criticizes the assessor's interpretation of the moratorium statute as requiring "a high degree of finality and permanence of restriction and prohibition of development" before the moratorium factor can be given effect in making an assessment. And further, that this "defeats the legislative intent to require consideration in each taxable year of governmental delays enjoined on the development and improvement of private property". These statements illustrate the majority's insistence upon equating "permitting delays" with "moratorium", as previously alluded to in this dissent. They also indicate a misconception of the assessor's position, as enunciated by his property evaluator, Mr. DeBartolo. It is clear from his entire testimony that he used the expressions  that the development had not "absolutely gone busted", "collapsed", not "done", or "finished"  to emphasize that the property was still regarded as property the highest and best use of which was for development as residential homesites. These expressions further explain his conclusion that nothing had occurred (prior to the assessment date) to indicate that a prospective purchaser would view the property as anything other than suitable for development as residential homesites, as did appellant at the time of purchase and continuously throughout the intervening years.
In addition, the assessor had other highly relevant information upon which to base his assessment not mentioned in the majority opinion. He testified that he was familiar with appellant's permitting problems; that he had in fact attended the County Board of Adjustment hearing at which appellant raised the question of the "moratorium" restricting or prohibiting the property's development; and that there was newspaper publicity of which he was aware concerning the problems appellant was experiencing in getting final approval for completion of the development. At no time was the assessor's office informed that the use, or intended use of the property, had undergone a change, although appellant had every opportunity to so inform the assessor, if that were the case, when Mr. DeBartolo contacted appellant's representatives in Miami by phone early in 1976 to discuss the property. The majority opinion seems to imply that the assessor valued the property as a fully developed residential subdivision, but this is not the case. Mr. DeBartolo specifically testified that he considered only the surveying and platting work, and the fourteen mile drainage canal as improvements to the property (all of which appellant continued to make use of when an overall plan was finally agreed upon in 1977), and that based upon the purchase price of $500.00 per acre in 1977, adjusted for time, these improvements could well be considered as adding from $150.00 to $200.00 per acre to the original purchase price, thereby confirming the present assessment of $700.00 per acre. He further stated that the $700.00 per acre assessment was "conservative enough" to reflect the permitting problems appellant was having. He stated specifically:
"Our Department felt that the $700.00 per acre at the time was still a fair market value with these problems."
Also, contrary to appellant's expert witness, Mr. DeBartolo said that only about 36% of the land is "bad land"; a portion of it is not wet all the time, and a portion is wet, unuseable without drainage; in some parcels there were large areas of cleared, grassy land that years ago probably was a cattle *727 operation; that all of the land was zoned "A-1, residential use", and all was valued as "undeveloped land speculation subdivision". Furthermore, he stated, it was valued "comparable to other undeveloped parcels".
In all candor, the testimony of appellant's expert witness was not entitled to serious consideration. First, he could suggest no use for the land except as a "hunting preserve". However, there is absolutely no evidence that the property was suitable for or could presently be used for that purpose. There was no evidence that would lead a reasonable person to believe that use of this A-1 residential land as a hunting preserve is the use to which the property could "be expected to be put in the immediate future", Section 193.011(2), Florida Statutes. Further, the land was divided into more than 5,000 parcels, and some 95% of these parcels had been sold to remote purchasers. There is no suggestion in the evidence presented by appellant or any other witness as to the feasibility of getting a lease agreement from some nearly 5,000 different purchasers so as to make the property useful as a hunting preserve. It is rather disturbing that the majority would base its decision upon any such prospective use of the property when there is in the record a sworn affidavit made by one of appellant's officials which specifically states that in addition to the permitting problem, the fact that the property has been deeded and sold under contracts in a "checkerboard" fashion, has rendered the land unsuitable for economical agriculture use, cattle grazing or any other economic use.
Secondly, the appellant's appraiser admitted that he completely failed to consider the eight criteria for valuation under Section 193.011, Florida Statutes. He stated that in his opinion these requirements were "something for the tax assessor to consider". This court held in St. Joe Paper Company v. Brown, 210 So.2d 725 (Fla. 1st DCA 1968), cert. discharged 223 So.2d 311 (Fla. 1969), that a taxpayer which confined its evidence of valuation of agricultural lands to the income method, and excluded mention of other enumerated criteria, failed to establish a prima facie case as to illegal excessiveness of the assessment on its forestry lands. Thus, it clearly appears from the appellant's appraiser's testimony that he based his opinion of value solely upon assumption of a use to which the property was not presently being put, nor could reasonably be expected to be put in the immediate foreseeable future, totally disregarding the statutory criteria for valuation for tax purposes. Under the holding of St. Joe Paper Company v. Brown, appellant's evidence was insufficient to establish the value of the property, and was properly rejected by the trial court.
Assessments and assessment roles are prima facie correct, and the prima facie correctness of an assessment when made by property officers must be affirmatively overcome by appropriate and sufficient allegations and proofs, excluding every reasonable hypothesis of legal assessment. 30 Fla. Jur. Taxation, § 261.
In the final judgment the trial court found, among other things, the following:
"... Here, the greater weight of the evidence supports the assessments as voluntarily corrected. Stretched to its greatest limit, plaintiff's evidence merely revealed the existence of a difference of opinion as to the value of the subject properties as of January 1, 1976. Very clearly, however, the property appraiser's opinion is more creditable and convincing and has greater logical and factual support, than the different opinion presented by plaintiff."
There is no justification for remand of this case to the trial court "for determination of the value of the property for its highest and best use" as directed by the majority opinion. This issue has already been fully tried, and the trial judge has made a determination on this issue based upon the conflicting evidence presented to him by the parties. The trial judge chose to believe the assessor's evidence establishing a value of $700.00 per acre, and to disbelieve appellant's evidence of $100.00 per acre. If this court rejects the trial court's *728 ruling on the conflicting evidence, and mandates a determination of the facts favorable to appellant, the court is compelled to adopt the figure of $100.00 per acre for this "hunting preserve".
I would affirm the judgment of the trial court which I find to be amply supported by the law and the evidence.
NOTES
[1] Webster's Third New International, Unabridged, at 1469 (1976).