527 S.E.2d 495 (1998)
206 W.Va. 633
WEST VIRGINIA HIGHLANDS CONSERVANCY, INC., Sierra Club, West Virginia Wildlife Federation, Chuck Merritt, and James M. Sconyers, Appellants,
v.
The PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, and Allegheny Energy System, Inc., Appellees.
No. 25048.
Supreme Court of Appeals of West Virginia.
Submitted October 7, 1998.
Decided December 14, 1998.
Dissenting Opinion of Justice Starcher December 16, 1998.
*496 Thomas R. Michael, Michael & Kupec, Clarksburg, West Virginia, Attorney for Appellants.
Cynthia L. Wilson, Charleston, West Virginia, Attorney for Public Service Commission.
James K. Brown, Michael A. Albert, Lee van Egmond, Jackson & Kelly, Charleston, West Virginia, Attorneys for Allegheny Energy.
PER CURIAM:[1]
Petitioner West Virginia Highlands Conservancy, Inc. ("Conservancy")[2] appeals from the December 30, 1997, order of the Public Service Commission ("Commission"), wherein the Commission concluded that it was without jurisdiction to conduct a post facto review of a real estate transaction involving land situated in the Blackwater River Canyon. Having carefully reviewed the statutes at issue, as well as all applicable law, we determine that the Commission did not err in its ruling and accordingly, we affirm.

*497 I. Factual and Procedural Background
The Conservancy filed a complaint with the Commission on September 30, 1997, against Allegheny Power System ("Allegheny"),[3] seeking to set aside a real property sale that had transpired seven months earlier on February 18, 1997.[4] The land at issue had been held since 1918 by West Virginia Power and Transmission Company ("West Virginia Power"), a West Virginia real estate holding company.[5] As grounds for its complaint, the Conservancy alleged that Allegheny was required by the provisions of West Virginia Code § 24-2-12 (1992), to obtain the Commission's approval before the land was sold.[6] While the grantor in the real estate transaction, West Virginia Power, is concededly not a public utility, the Conservancy advanced the position that Allegheny was nonetheless responsible for the sale of such property as the parent company of West Penn Power Company ("West Penn"), who is the parent company of West Virginia Power. See supra note 5. Based on the recent corporate reorganization of Allegheny, which involved managerial streamlining and the consolidation of various operations with the goal of promoting a "one company concept," the Conservancy contended that Allegheny is the same company that provides utility services to West Virginia customers. As such, the Conservancy argues that the provisions of West Virginia Code § 24-2-12, requiring Commission approval of various public utility transactions, should apply to Allegheny.
In response to the complaint filed against it, Allegheny moved to dismiss the Conservancy's complaint on the grounds that Allegheny is not a public utility subject to the Commission's jurisdiction. Asserting that it is a public utility holding company[7] prohibited by federal law from engaging in public utility services,[8] 15 U.S.C. § 79d(a) (1994), Allegheny argued that the jurisdictional reach of the Commission did not extend to it or West Penn or West Virginia Power.
By order dated December 30, 1997, the Commission stated its finding that none of the entities involved in the Blackwater River Canyon land sale were public utilities regulated by the Commission. In addition, the Commission determined that no West Virginia public utility assets were involved in the disputed transaction. Concluding that it was without authority to review the transaction in issue, the Commission dismissed the complaint and refused to grant the Conservancy's request for permission to take the deposition of Alan J. Noia, Allegheny's President and chief executive officer.[9] The Conservancy appeals from the Commission's ruling that it has no jurisdiction over Allegheny, as well as the denial of its discovery request.

II. Standard of Review
Unlike most appeals from Commission rulings, this case does not fall within the three-pronged standard of review prototype set forth in syllabus point one of Central *498 West Virginia Refuse, Inc. v. Public Service Commission, 190 W.Va. 416, 438 S.E.2d 596 (1993).[10] When, as in the instant case, the Commission's denial of jurisdiction is the basis for the appeal, the paradigm for reviewing Commission rulings is of little help. See West Virginia-Citizen Action Group v. Public Service Commission, 175 W.Va. 39, 42-43, 330 S.E.2d 849, 852 n. 6 (1985). More applicable to this case, which presents an issue of jurisdictional denial, is our recognition in syllabus point one of Appalachian Power Co. v. State Tax Department, 195 W.Va. 573, 466 S.E.2d 424 (1995), that "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to de novo review."
While the parties are in agreement that jurisdictional issues invoke de novo review, Allegheny asserts that "[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." Appalachian Power, 195 W.Va. at 588, 466 S.E.2d at 439 (citing Lincoln County Bd. of Educ. v. Adkins, 188 W.Va. 430, 424 S.E.2d 775 (1992), syl. pt. 7, in part). With reference to the Commission's finding that Allegheny is not a public utility, Allegheny argues that the Commission's findings of fact cannot be reversed under Boggs v. Public Service Commission, 154 W.Va. 146, 174 S.E.2d 331 (1970), absent a conclusion that such findings are contrary to the evidence or that they lack supporting evidence. See id. at 147, 174 S.E.2d at 332, syl. pt. 5, in part (citing United Fuel Gas Co. v. Public Service Comm'n, 143 W.Va. 33, 99 S.E.2d 1 (1957)). Against these principles, we proceed to consider whether the Commission correctly determined that it lacked jurisdiction to review the subject land transaction.

III. Discussion
Our determination of whether the Commission has authority to review the land sale at issue necessarily requires an examination of the nature of the Commission's jurisdiction. In syllabus point two of Wilhite v. Public Service Commission, 150 W.Va. 747, 149 S.E.2d 273 (1966), we stated: "The Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to regulation of public utilities. It has no inherent power or authority." Thus, the Commission is without power to consider issues not expressly included within its grant of legislative authority.
The jurisdictional question presented in this case arises from the Conservancy's position that Allegheny failed to comply with the provisions of West Virginia Code § 24-2-12. That statute provides, in pertinent part:
Unless the consent and approval of the public service commission of West Virginia is first obtained: ... (c) no public utility subject to the provisions of this chapter,... may assign, transfer, lease, sell, or otherwise dispose of its franchises, licenses, permits, plants, equipment, business or other property or any part thereof, but this shall not be construed to prevent the sale, lease, assignment or transfer by any public utility of any tangible personal property which is not necessary or useful, nor will become necessary or useful in the future, in the performance of its duties to the public[.]
W. Va.Code § 24-2-12(c) (emphasis supplied). By legislative fiat, this consent and approval provision only applies to property dispositions contemplated by public utilities.[11] Our inquiry thus proceeds to the issue which is, in fact, the crux of this case whether Allegheny comes within the statutory definition of "public utility."
The term "public utility" is defined by West Virginia Code § 24-2-1 (1992) as "any *499 person or persons, or association of persons, however associated, whether incorporated or not, including municipalities, engaged in any business, whether herein enumerated or not, which is, or shall hereafter be held to be, a public service." The following amplification of that definition was stated in syllabus point three of Wilhite:
The test as to whether or not a person, firm or corporation is a public utility is that to be such there must be a dedication or holding out either express or implied that such person, firm, or corporation is engaged in the business of supplying his or its product or services to the public as a class or any part thereof as distinguished from the serving of only particular individuals; and to apply this test the law looks at what is being done, not to what the utility or person says it is doing.
150 W.Va. at 748, 149 S.E.2d at 274, syl. pt. 3.
The Conservancy's position that Allegheny does come within the definition of a public utility sufficient to invoke the provisions of West Virginia Code § 24-2-12 is rooted in its view that Allegheny's corporate restructuring significantly altered the manner in which Allegheny and its subsidiaries conduct business. As a result of a corporate reorganization that Allegheny underwent in 1995, Allegheny now utilizes a single management team to direct both its functions as a public utility holding company and the operations of its three utility subsidiaries.[12] All the operating, engineering, marketing, and other functions previously performed on a separate basis by its utility subsidiaries are now combined and managed through Allegheny Power Service Corporation ("APSC"), a wholly-owned subsidiary of Allegheny. See supra note 12. To illustrate, whereas previously each of the operating utility subsidiaries had individual employees, those same workers are now designated as employees of APSC. See id. Similarly, customers of the operating utility subsidiaries no longer get monthly utility bills from Monongahela Power or Potomac Edison or West Penn; instead, their bills designate Allegheny as the utility provider. Contending that Allegheny has taken complete control of the operations of its utility subsidiaries, the Conservancy argues that this Court should look beyond the corporate structures of Allegheny and its subsidiaries to find that Allegheny is operating as a public utility.[13]
In support of its position, the Conservancy suggests that the factors typically used for deciding whether to "pierce the corporate veil" for purposes of holding shareholders personally liable for the actions of a corporation should analogously be utilized to find the existence of jurisdiction in this case. See Laya v. Erin Homes, Inc., 177 W.Va. 343, 352 S.E.2d 93 (1986).[14] According to the *500 Conservancy, the decisions of this Court addressing when parent and subsidiary corporations can be viewed as "one entity" for purposes of personal jurisdiction provide additional support for its position that the Commission has jurisdiction over Allegheny. See Bowers v. Wurzburg, 202 W.Va. 43, 501 S.E.2d 479 (1998); State ex rel. Bell Atlantic-West Virginia v. Ranson, 201 W.Va. 402, 497 S.E.2d 755 (1997); Norfolk Southern Ry. Co. v. Maynard, 190 W.Va. 113, 437 S.E.2d 277 (1993).
In response to the Conservancy's assertion that Allegheny has complete control of its utility subsidiaries, Allegheny states that federal law expressly prohibits public utility holding companies such as Allegheny from owning or acquiring utility assets. See 15 U.S.C. § 79d(a). Federal law also proscribes a public utility holding company from engaging in any acts that would cause it to be a "public utility." 15 U.S.C. § 79i. In explanation of its corporate reorganization, Allegheny states that the reorganization was effectuated for the joint purposes of cost containment and to meet competition in the wake of pending utility deregulation. Allegheny emphasizes that the separate corporate status of the utility subsidiaries has not been affected or altered as a result of the reorganization. There has been no transfer of physical assets among the separate companies; no new legal entities were created; and no existing legal entities were dissolved. The rate bases of the various utility subsidiaries remain separate and distinct, as always. Expenses are calculated separately for each utility subsidiary. West Virginia property, business and occupation, and sales and use tax returns are filed on an individual basis by each utility and non-utility subsidiary. Separate shareholder meetings are held and separate minutes are maintained. As before, each utility subsidiary maintains its own customer rates. In short, Allegheny asserts that each utility subsidiary complies with all the requirements necessary to maintain its separate corporate status.
Concerning the Conservancy's contention that jurisdiction can be achieved through the doctrine of corporate veil piercing, Allegheny asserts that such doctrine is inapposite. *501 Typically, veil piercing is a method by which liability is extended from the corporation to the individual shareholders for the purpose of preventing fraud or to right a particular wrong. See Laya, 177 W.Va. at 346-50, 352 S.E.2d at 97-100. The Commission argues that use of the veil piercing doctrine for the purpose of creating continuing subject matter jurisdiction over a public utility holding company, as the Conservancy advocates, is completely inconsistent with the rationale of such doctrine. Whereas veil piercing enables liability to be asserted for the purpose of correcting a specific wrong or to prevent fraud notwithstanding corporate rules limiting liability, the use of such doctrine in the manner proposed by the Conservancy would involve a determination that the Commission has subject matter jurisdiction over a particular corporation, not just in this case, but in every future transaction that involves any subsidiary of Allegheny. In a similar vein, Allegheny contends that the Conservancy's reliance on those cases where veil piercing factors have been employed for purposes of determining whether personal jurisdiction could be asserted over a parent corporation whose subsidiary had committed a wrong in this state is equally untenable. See Bowers, 202 W.Va. 43, 501 S.E.2d 479; Bell Atlantic, 201 W.Va. 402, 497 S.E.2d 755; Norfolk Southern Ry., 190 W.Va. 113, 437 S.E.2d 277.
Upon examination, the Conservancy's arguments in support of veil piercing for the purpose of creating jurisdiction prove specious. Critically, the principles upon which veil piercing is predicatedliability may be asserted when the corporate form is being used to perpetrate harm or injusticedo not transpose to support the creation of subject matter jurisdiction. This is especially true where, as here, subject matter jurisdiction is created by, and defined by, statute. See W. Va.Code § 24-2-1. The Commission observes that the Conservancy has failed to cite even one case in which corporate veil piercing was used against a public utility holding company to assert subject matter jurisdiction on the theory that the holding company was operating as a public utility, as the Conservancy urges this Court to conclude in this case. Because liability and subject matter jurisdiction are very different legal concepts, no other court has been persuaded to apply the corporate veil piercing doctrine in the fashion advocated by the Conservancy.
This critical distinction concerning the uniqueness of subject matter jurisdiction proves equally fatal to the Conservancy's attempt to rely on decisions issued by this Court that addressed whether a company was doing business within this state under a minimum contacts analysis. In each of those decisionsBowers, Bell Atlantic, and Norfolk Southernthe issue was whether a company was doing business within this state sufficient to permit this state to exercise personal jurisdiction over the parent corporation in connection with claims predicated on traditional tort or contract theories. None of those cases involved the situation presented in the case sub judice where subject matter jurisdiction is expressly governed by statute.[15] Moreover, the jurisdictional concerns and attendant issues raised in a minimum contacts analysis necessarily involve personal jurisdiction, a beast significantly distinct from the issue of subject matter jurisdiction that is under consideration here. Since the Commission's jurisdiction is expressly limited by statute to individuals or companies qualifying as public utilities, facts that are critical to a veil piercing analysis are not determinative of whether Allegheny qualifies as a public utility. See W. Va.Code § 24-2-1. Thus, we agree with Allegheny that the cases relied on by the Conservancy as support for its veil *502 piercing theory are both distinguishable and inapplicable.
Even assuming, arguendo, that the doctrine of veil piercing was applicable for purposes of establishing subject matter jurisdiction, it appears that the law would still not support veil piercing under the facts of this case. While the law presumes that two separately incorporated businesses are distinct entities, United States v. Bestfoods, 524 U.S. 51, 118 S.Ct. 1876, 1888, 141 L.Ed.2d 43 (1998), this presumption can be disregarded when the corporate form is being used to perpetrate injustice, defeat public convenience, or justify wrongful or inequitable conduct. Laya, 177 W.Va. at 347, 352 S.E.2d at 97 (quoting Southern States Coop., Inc. v. Dailey, 167 W.Va. 920, 930, 280 S.E.2d 821, 827 (1981)). While a variety of factors are typically examined to determine whether veil piercing is warranted,[16] the Conservancy contends that veil piercing is required in this case based on the use of dual officers and directors, its use of a trade name ("Allegheny") for operational purposes, and its employment of streamlined management. In Bestfoods, the United States Supreme Court made clear that "`it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.'" 524 U.S. at 69, 118 S.Ct. at 1888 (quoting American Protein Corp. v. AB Volvo, 844 F.2d 56, 57 (2nd Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988)). Moreover, the Supreme Court recognized in Bestfoods that those activities "which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures" do not indicate that the parent corporation is in fact controlling the subsidiary. 524 U.S. at 72, 118 S.Ct. at 1889 (quoting Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U.L.Q. 223, 282 (1994)). The United States Supreme Court reasoned in Bestfoods that veil piercing is proper when "a facility is so pervasively controlled by its parent [corporation] for a sufficiently improper purpose." Id. at 64, n. 10, 118 S.Ct. at 1886, n. 10. In this case, the Conservancy has failed to demonstrate that Allegheny's corporate reorganization was effectuated for, or is being used for, an improper purpose that would justify the use of veil piercing principles. See Laya, 177 W.Va. at 347, 352 S.E.2d at 97.
In the final analysis, the issue of whether the Commission has subject matter jurisdiction over the Blackwater River Canyon land sale must be resolved by reference to the body of law which governs public utilities. As discussed above, the Commission's jurisdiction is expressly limited to those matters involving public utilities. W. Va.Code § 24-2-1. By definition, a public utility involves the holding out or dedicating of a product or services to the public. See id.; Wilhite, 150 W.Va. at 760, 149 S.E.2d at 281. In this case, the land at issue has never been used to supply any utility services to the West Virginia public. Neither has that parcel of land ever been reported as an asset or been included in the rate base of a West Virginia public utility. The statute upon which the Conservancy asserts entitlement to post facto review of the land sale only applies to public utilities. See W. Va.Code § 24-2-12. Yet, Allegheny, as a public utility holding company, is proscribed by federal law from operating as public utility. See 15 U.S.C. § 79i(a)(1). Upon the facts of this case, there is only one conclusion that can be reached: Allegheny is not a public utility subject to the jurisdiction of the Commission. Accordingly, we find that the Commission was correct in its determination that it lacked jurisdiction to proceed on the merits of the Conservancy's complaint.[17]
We are sympathetic to the environmental concerns that obviously motivated the Conservancy to initiate the cause of action below and we fully recognize that the sale of the *503 Blackwater River Canyon property may have significant environmental implications for West Virginia. Unfortunately, the Commission is simply not the appropriate forum to challenge a land sale on the basis of the negative environmental consequences that such sale may spawn.[18] Moreover, we must observe that even if the Conservancy had obtained the relief they were seeking before this Courta finding of jurisdiction before the Commissionthey still would not be in a position to have their environmental concerns addressed. This is because the Commission's function under West Virginia Code § 24-2-12 does not entail withholding consent for real estate sales based on a negative environmental impact. The limited nature of the Commission's duty under that statutory provision is simply to examine the proposed sale in terms of how it will impact on the provision of utility services to the consumers of this state. Quite simply, the Commission cannot, based on its limited review functions, address the environmental concerns that are the crux of the Conservancy's decision to litigate this matter.
The preservation of the Blackwater Canyon is an emotional issue and well it should be. There is an inherent tension between private property rights and public environmental concerns, and growing interest in the development of public policy that will preserve the integrity of our environment for future generations. Although historically the right to hold private property has been sacrosanct in our democracy, American property law at the close of the twentieth century must mediate to some extent between protecting the individual freedoms of property owners and the interests of the community at large. See Terry W. Frazier, Protecting Ecological Integrity Within the Balancing Function of Property Law, 28 Environmental Law 53, 109 (1998). "The use of private property is increasingly subject to government regulation in the public interest to protect the environment and guard against thoughtless development." Atlantic Int'l Inv. Corp. v. Turner, 381 So.2d 719, 722 (Fla.Dist.Ct.App.1980). It has been recognized, however, that while
we have begun to acknowledge our dependence upon ecological integrity, the process of including protection of ecological integrity in the balancing function of property law is nowhere near complete. Our understanding and legal recognition of humankind's place in land communities lags behind our understanding and recognition of the importance of humans' relations to each other. Property laws do not reflect principles of biology, ecology, and other natural sciences to anywhere near the extent that property laws reflect principles of philosophy, sociology, economics, and other social sciences.
Frazier, supra, 28 Environmental Law at 110.
If the natural integrity of the Blackwater River Canyon is destroyed, it will be a tragedy for the people of West Virginia. It is unfortunate that state government has not taken a more active role in the stewardship of our environment by developing both law and public policy that takes environmental concerns into account; that environmental organizations were not more aggressive in seeking to purchase and preserve this land at an earlier point in time; and that West Virginia Power did not show more corporate responsibility to this state by selling the land to environmentalists for purposes of preservation notwithstanding the realization of reduced profits.
The harsh reality is that the protection of the environment, and not utility regulation, is what is truly at stake here; the Public Service Commission, however, is not the forum to address environmental concerns. Consequently, a holding by this Court finding jurisdiction before the Commission would not only convolute the law, but in the final analysis would clearly afford no real relief to the Conservancy and no protection to the Blackwater River Canyon.
*504 Based on the foregoing, the decision of the Public Service Commission is hereby affirmed.
Affirmed.
Justice McGRAW did not participate in the decision of this case.
STARCHER, Justice, dissenting:

(Filed Dec. 16, 1998)
I begin with a quotation that seems to me to be highly relevant to the instant case. It is an excerpt of the March 4, 1893 inaugural address of Governor William A. MacCorkle:
There are several matters, however, of great importance to the State and to the people, upon which is due the information as to the policy of this administration for the next four years.
First among these questions of interest to the State is the question of the ownership of lands.
The State is rapidly passing under the control of large foreign and non-resident land owners. We welcome into our State the immigrant who comes to us with the idea of home seeking and home building with all its profits to the State, with its family ties, with its clearing of the forests, its building of church and school houses, its expenditure of all that is made in our State, and its exercise of citizenship. But the men who to-day are purchasing the immense areas of the most valuable lands in the State, are not citizens and have only purchased in order that they may carry to their distant homes in the North, the usufruct, of the lands of West Virginia, thus depleting the State of its wealth to build grandeur and splendor in other States. In a few years at the present rate of progress, we will occupy the same position of vassalage to the North and East that Ireland does to England, and to some extent, for the same reasons.
Public Papers of Governor William A. MacCorkle, 9-10 (1897).
One hundred and five years later, the question of the ownership and sale of the lands of this State is still pressing upon us. In the instant case, our State is being depleted of its wealth to build the grandeur and splendor of a foreign holding company that calls itself an electric utility, acts like an electric utility, and has reorganized itself so that it functions as one, unified electric company. Yet this company still evades public scrutiny because, before the Public Service Commission, it claims that it is not really an electric utility.
In its 1995 reorganization, Allegheny Power employed "smoke and mirrors"an illusion done on paperso that it could operate as a single utility company, but claim it was a conglomerate of small, independent companies. Allegheny Power operates as a single corporate body, using electricity generated by the right hand to supply customers who are sitting at the left. Allegheny Power holds itself out to the public as one, unitary public utility companybut when the public asks, "are you really acting for our benefit?" Allegheny Power smiles and says "none of your businesswe're not a public utility company."
The majority opinion not only begrudgingly gives its blessing to that illusion, the majority says that the Public Service Commission, the public agency charged with making sure public utilities act in the public's best interests, cannot look behind the smoke and mirrors.
The result is that Allegheny Power gets the milk without having to buy the cowit gets to drink in profits from selling electricity to the citizens of West Virginia, without having to submit its activities to the scrutiny of the Public Service Commission.
This is wrong, because in this case, the illusion has concrete, permanent, and in my judgment, devastating consequences for the people of this State. I therefore dissent.

A.

Allegheny Power Holds Itself out to the Public as a Public Utility
Allegheny Power's sale of the Blackwater Canyon should be subject to the jurisdiction of the Public Service Commission for a simple reason: Allegheny Power holds itself out to the public as a single, unified public utility company. I am at a loss to understand how *505 a company can act and make profits under the guise of being one company, but, when it comes to taking responsibility, say that its smaller subsidiary companiescompanies that exist only on papershould be the focus of attention. This is an illusion, and justice demands that the people be allowed to look behind an illusion.
We said in Syllabus Point 3 of Wilhite v. Public Service Commission, 150 W.Va. 747, 149 S.E.2d 273 (1966) that the test as to whether or not a corporation is a public utility involves "look[ing] at what is being done, not to what the utility or person says it is doing." (Emphasis added.) Basically, the Public Service Commission should look at whether the corporation is holding itself out as being "engaged in the business of supplying... its product or services to the public as a class...." In this case, when it is to its own benefit, Allegheny Power holds itself out as being engaged in the business of supplying electricity to West Virginia consumers.[1] Conversely, when it wants to avoid government regulation, Allegheny Power claims that it is only a holding company that has never been involved in the electricity business.[2]
Allegheny Power says that West Penn Power Company (the owner of West Virginia Power and Transmission Company, and thus the owner of the Blackwater Canyon property) was once a separate, independent companybut West Penn has now been replaced by a company called "Allegheny Power." On its Internet home page (http://www.alleghenypower.com), Allegheny Power says that "Some of you have known us in the past as Monongahela Power, Potomac Edison, or West Penn Power.... Now we're Allegheny Power. We changed our name and the way we do business so we can remain strong and competitive among the nation's electric utility companies." (Emphasis added.)
Thus, in its own writings, Allegheny Power calls itself an "electric utility compan[y]." Allegheny Power also acts like an electric utility company. Still, the Public Service Commission ignored Allegheny Power's public statements and actions. Instead, the Public Service Commission relied upon Allegheny Power's courtroom statements that it isn't an electric utility company, but rather is merely a holding company that owns stock in several utility companies.
Applying the Public Service Commission's reasoning, when the king says he is fully clothed, we must all agreeeven though he is standing there buck naked.
In other Allegheny Power writings, the company discusses its "commitment to the environment" in West Virginia. Each time Allegheny Power talks about itself as one utility company, not as a holding company for several smaller utilities. For example, one brochure posted on Allegheny Power's Internet home page states that, "At Allegheny Power, environmental stewardship and leadership is not just something we talk about, it's our commitment.... Because at Allegheny Power, we believe it's our responsibility to protect the environment for our Company, our customers, and for future generations."
Allegheny Power, before this Court and the Public Service Commission, claims it owns no power generating plants, sells no electricity, and is therefore not a public utility. Yet, when it is to the benefit of Allegheny's public image, the company says about a power plant located in Haywood, West Virginia, "Harrison Power Station, Allegheny Power's largest generating plant, is home to some of the most sophisticated air pollution-control *506 equipment...." (Emphasis added). At another point in the same brochure, Allegheny Power touts a program that "takes place in our West Virginia service territory." (Emphasis added)
Power plants typically make electricity for public consumption. The term "service territory" implies that public service is being supplied to a region. I am therefore at a loss to understand how Allegheny Power can claim to own a large power generating plant and have a West Virginia service territory, and still not be a public utility subject to Public Service Commission jurisdiction.

B.

Allegheny Power holds itself out as the owner of the Blackwater Canyon
When it's good for public relations, Allegheny Power takes credit for donating part of its Blackwater Canyon properties to the State for the creation of Blackwater Falls State Park. On its Internet home page, in a public-relations brochure discussing the environment, Allegheny Power claims:
The majestic Blackwater Falls area in West Virginia became part of the public landscape in 1953 when Allegheny Power donated 600 acres to the state of West Virginia, ensuring that the natural beauty of this area would be preserved.
Amazingly, while Allegheny Power claims on the one hand that it donated 600 acres of the Blackwater Canyon to the State in 1953, it claims on the other hand before the Public Service Commission and before this Court that it never owned that land. Which is true?
I recognize that the donation of the Blackwater Canyon land in 1953, and the later sale of 3,000 acres in 1996, were ostensibly performed under the name of the West Virginia Power and Transmission Company. However, I'm curious to know where the money went from that saleif Allegheny Power management made the actual decision to sell the Canyon land, and if Allegheny Power's treasury received the money from the sale, or if Allegheny Power's in-house lawyers negotiated and oversaw the sale, then that sale should be open to scrutiny by the Public Service Commission.

C.

The Sale of the Blackwater Canyon Property is Subject to Scrutiny by the Public Service Commission
The Public Service Commission exists to regulate public utilities, and oversee how services are provided and rates charged. As part of that oversight, our laws say that a public utility must get the Public Service Commission's approval every time it tries to "assign, transfer, lease, sell, or otherwise dispose of its ... property or any part thereof...." W.Va.Code, 24-2-12 [1984].
The reason should be obvious: when a public utility buys or sells property, it normally makes or loses money. That affects the total assets of the public utility, and thus affects the rates that consumers pay for utility services. Every transaction that affects services to the public should be subjected to public scrutiny.
It is a fundamental rule of law that "[A] public service commission may look through the corporate form of affiliated corporations and probe for economic realities.... [W]hen an operating public utility which is subsidiary to a holding company is seeking a rate increase, all of the various ways in which the parent company receives profits from the subsidiary should be considered in establishing the rate of return that the owner of the subsidiary should receive." 64 Am.Jur.2d § 202, "Public Utilities."
By selling the Blackwater Canyon property, Allegheny Power disposed of land that might have been used for building hydroelectric generating facilities, might have been used for the construction of power transmission lines, or might have been judiciously timbered, to generate income for the utility or might have been sold to the National Park Service, which wants to buy the land for public recreation. The sale, which is the subject of the instant case, has generated income that could be used to lower the price of electricity paid by West Virginia consumers. That sale affects the West Virginia utility-buying publicand therefore is subject to review by the Public Service Commission.
Furthermore, the Public Service Commission has been charged with "balancing the *507 interests of current and future utility customers, the general interests of the State's economy and the interests of the utilities...." W.Va.Code, 24-1-1(b) [1986]. Tens of thousands of tourists visit Blackwater Falls State Park, and look out across the land sold by Allegheny Power. That land is now being scalped clean of all trees, and the run-off is polluting the Blackwater River and killing the remaining flora and fauna.[3] Tourism to the Blackwater Falls State Park region is certainly in the "general interests of the State's economy," and will likely suffer when the Blackwater Canyon is gutted of all vegetation. But the Public Service Commission has ignored the general interests of the State's economy and denies that it has jurisdiction over Allegheny Power. The Commission has allowed the sale of West Virginia's "Grand Canyon" to a timber company, without public scrutiny. The Commission has thereby cut off its nose to spite its faceor, in this case, is allowing the trees of the Blackwater Canyon to be cut down to spite West Virginia's tourism industry.

D.

Conclusion
Allegheny Power looks, sounds, and acts like a public utility. Accordingly, it is a public utility. I therefore disagree with the majority opinion holding it is not.
I believe that the Public Service Commission clearly had jurisdiction in this case, or at a minimum, should have allowed the Highlands Conservancy the right to conduct discovery, to see what was hidden in the smoke and mirrors. By holding that Allegheny Power isn't a power company, the majority opinion has allowed an illusion of corporate law to defeat the obvious realitythat the sale of the Blackwater Canyon has adversely impacted West Virginia citizens.
Are we right back where we started a century ago? A foreign corporation is "depleting the State of its wealth to build grandeur and splendor in other States," and doing so to the detriment of West Virginia consumers. It appears that some things change; some things don't. As happened a century ago, are we willing to sit back and letting it happen? I pray not.
I therefore dissent.
NOTES
[1] We point out that a per curiam opinion is not legal precedent. See Lieving v. Hadley, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).
[2] In addition to the Conservancy, the Sierra Club and the West Virginia Wildlife Federation are named plaintiffs in this case. Chuck Merritt and James M. Sconyers are named as individual plaintiffs.
[3] Allegheny Power System has since changed its name to Allegheny Energy.
[4] The Conservancy was unsuccessful in its attempt to buy the piece of property at issue. It was outbid on the property by Canyon Lands, who purchased the property for $4,850,000. The property has since been reconveyed by Canyon Lands to Allegheny Wood Products. According to representations made during oral argument, the current owner of the subject piece of property is already timbering the land. Although the Conservancy did not apply for a stay in this case, this Court's jurisdiction to rule on such relief would be limited as Allegheny Wood Products is not a party to these proceedings.
[5] West Virginia Power and Transmission Company is a wholly-owned subsidiary of West Penn Power Company, a Pennsylvania public utility. West Penn Power Company is a subsidiary of Allegheny.
[6] Since the land at issue has already been sold, the Conservancy seeks to have the land sale declared null and void for failure to comply with West Virginia Code § 24-2-12.
[7] As a public utility holding company, the only assets Allegheny has are the stocks of utility companies.
[8] Pursuant to 15 U.S.C. § 79i(a)(1) (1994), a public utility holding company is prohibited by federal law from providing utility services unless it first receives permission to do so from the Securities and Exchange Commission ("SEC"). Allegheny states that it has not applied to the SEC for such permission.
[9] Mr. Noia is also the CEO of Monongahela Power Company, Potomac Edison Company, West Penn Power, all three of which are utility subsidiaries of Allegheny.
[10] Most appeals arising from the Commission involve the following standard of review: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and (3) whether the substantive result of the Commission's order is proper. See Central West Virginia Refuse, 190 W.Va. at 416-17, 438 S.E.2d at 596-97, syl. pt. 1.
[11] Obviously, any personal property that meets the description of the proviso language contained in West Virginia Code § 24-2-12 is exempted from the consent and approval requirements of that provision.
[12] Allegheny is the parent corporation of three operating utility subsidiaries: Monongahela Power, Potomac Edison, and West Penn. Monongahela Power is an Ohio Corporation that provides electric services to citizens of both West Virginia and Ohio. Potomac Edison is a Maryland and Virginia corporation that provides utility services to customers located in Maryland, West Virginia, and Virginia. West Penn is a Pennsylvania corporation whose service area lies entirely within Pennsylvania.

Two additional corporations are subsidiaries of Allegheny. They are Allegheny Power Service Corporation and AYP Capital, Inc. Neither of these subsidiaries are in the business of providing utility services. According to Allegheny, Allegheny Power Service Corporation acts as a mutual service company for Allegheny's subsidiaries, in accordance with 12 U.S.C. § 79m (1994) and SEC regulations. AYP Capital is a non-regulated subsidiary that engages in various unregulated businesses as permitted by the SEC.
[13] As additional support for its position that Allegheny is a public utility, the Conservancy cites this Court's observation in Boggs v. Public Service Commission, 154 W.Va. 146, 174 S.E.2d 331 (1970), that "`the distinguishing characteristic of a public utility is the devotion of private property by the owner or person in control thereof to such a use that the public generally, or that part of the public which has been served and has accepted the service, has the right to demand that the use or service, as long as it is continued, shall be conducted with reasonable efficiency and under proper charges.'" Id. at 151-52, 174 S.E.2d at 335 (quoting 73 C.J.S. Public Utilities § 1 and emphasis supplied).
[14] In Laya, we identified the following factors as useful in analyzing the issue of corporate veil piercing:

(1) commingling of funds and other assets of the corporation with those of the individual shareholders;
(2) diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders);
(3) failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock, such as formal approval of the stock issue by the board of directors;
(4) an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation;
(5) failure to maintain corporate minutes or adequate corporate records;
(6) identical equitable ownership in two entities;
(7) identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties);
(8) failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking;
(9) absence of separately held corporate assets;
(10) use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation;
(11) sole ownership of all the stock by one individual or members of a single family;
(12) use of the same office or business location by the corporation and its individual shareholder(s);
(13) employment of the same employees or attorney by the corporation and its shareholder(s);
(14) concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders (sole shareholders do not reveal the association with a corporation, which makes loans to them without adequate security);
(15) disregard of legal formalities and failure to maintain proper arm's length relationships among related entities;
(16) use of a corporate entity as a conduit to procure labor, services or merchandise for another person or entity;
(17) diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another;
(18) contracting by the corporation with another person with the intent to avoid the risk of nonperformance by use of the corporate entity; or the use of a corporation as a subterfuge for illegal transactions;
(19) the formation and use of the corporation to assume the existing liabilities of another person or entity.
177 W.Va. at 347-48, 352 S.E.2d at 98-99.
[15] Since one of the many claims asserted in Bell Atlantic involved inside wire maintenance services, which comes within the province of the Commission, we determined that the circuit court and the Commission had concurrent jurisdiction in that case. Notwithstanding the doctrine of primary jurisdiction, which, if applied, would require the circuit court to "refrain from exercising jurisdiction until after the agency has resolved the issue" under its jurisdiction, we determined that the circuit court had properly retained jurisdiction of the case as the legal issues under consideration (violations of antitrust and consumer protection laws as well as common law theories) were "well within the conventional experience of the circuit court." 201 W.Va. at 411, 497 S.E.2d at 764, 766.
[16] See supra note 14.
[17] Based on our decision that the Commission is without jurisdiction, we do not address the Conservancy's assignment that the Commission committed error in refusing to grant its request to conduct discovery.
[18] The Conservancy recently filed an action in federal court under the Endangered Species Act of 1973, 16 U.S.C. § 1531 to 1544 (1994), wherein they alleged that four species of animals indigenous to this state (northern flying squirrel, Cheat Mountain salamander, Indiana bat, and Virginia big-eared bat) are being harmed as a result of the timbering operations that are currently in progress on the subject land.
[1] Allegheny Power's Internet home page (www.alleghenypower.com), states that "Allegheny Power serves an area of about 29,000 square miles, and about 1.4 million customers in parts of Maryland, Ohio, Pennsylvania, Virginia and West Virginia.... Our customers include more than a million residences from central West Virginia to the New York border...."
[2] Allegheny Power argues that it is not a public utility because it is prohibited by federal law from engaging in public utility services. This argument makes no sensepeople are prohibited by law from running stop signs, but they do it every day. Allegheny Power could be operating as a public utility and could be in violation of federal law, but we will never know, because the Public Service Commission denies it has jurisdiction over Allegheny Power, and has kept the Highlands Conservancy from conducting the discovery necessary to prove that the Public Service Commission has jurisdiction.
[3] It appears that history is repeating itself in the Blackwater River region. The Blackwater Canyon has previously sustained massive ecological damage from the cutting of trees. At the turn of the century, the Canyon was devastated by the uncontrolled cutting of timber, and the environment suffered from the pollution caused by the resulting lumber, pulp and paper industries.

Stephen B. Elkins, the owner of several railroads and pulp and paper mills in the Blackwater River region, disputed that industry had caused any damage to the environment in a December 20, 1909 letter to William A. MacCorkle:
Dear Governor MacCorkle:
You are on the Commission, and I believe the Chairman, appointed to look into and make investigation of the pollution of the Kanawha and Gauley rivers. Under this authority I believe your Commission has undertaken some investigation into Cherry river at Richwood, where there are situated some pulp and paper mills.
At first it occurred to me perhaps your authority to look into the pollution of the Kanawha and Gauley rivers did not authorize you to go up as far as Cherry, in any event, I want to assure you that the pulp and paper mills at Richwood are doing all they can to avoid the pollution of the river at that place.
Prior the establishment or building at that point, there were never any use made of the water and there were no fish in the stream.
The investigation of your Commission has caused some uneasiness at Richwood and vicinity, and affects to some extent the development of that part of the State; I mean the extension of a branch line of the B. & O. Railroad. Now, you know it would be a great damper on future industries if these mills were compelled to close down on account of the supposed pollution of the streams.
Will you kindly look into this matter and write me, so that I may know what to say to some Railroad friends. I think it important that nothing occur which would prevent the extension of a railroad in that vicinity.
 Very truly yours,
 /s/ S.B. Elkins
Elizabeth M. Hulett, The Elkins Letters (1995), citing 99 Stephen B. Elkins Letter Books 341-42 (Davis & Elkins College Collection, Elkins, West Virginia).